# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**CONSUMER FINANCIAL
PROTECTION BUREAU,**

**Plaintiff,**

**v.**

**JAMES R. CARNES, et al.,**

**Defendants.**

Case No. 23-2151-DDC-TJJ

## MEMORANDUM AND ORDER

The Consumer Financial Protection Bureau has a $38,453,341.62 judgment against James Carnes[1] and his company, Integrity Advance, LLC, for restitution for losses imposed by an illegal payday lending scheme.  James Carnes also owes the Bureau a civil penalty of $5,000,000 and Integrity Advance owes a $7,500,000 penalty.  Neither Integrity Advance nor James Carnes have made any payment on the judgment.

After the Bureau served a Civil Investigation Demand on Integrity Advance in 2013, James Carnes transferred over $12,000,000 to his wife's trust.  The Bureau alleges that these transfers were fraudulent and brought this fraudulent transfer action under the Federal Debt Collection Procedures Act.  Defendants James Carnes and the James R. Carnes Revocable Trust, dated February 10, 2010, have filed a Motion to Dismiss (Doc. 17).  And defendant Melissa C. Carnes has filed a Motion to Dismiss or, in the Alternative, Motion to Stay (Doc. 19).  As explained below, the court denies both motions.[2]

---

[1]      Because this case involves two defendants with the same last name, this Memorandum and Order refers to the defendants by their full names to avoid confusion.

[2]      At a hearing in the case, defendants requested oral argument.  D. Kan. Rule 7.2 provides, "The court may set any motion for oral argument or hearing at the request of a party or on its own initiative."

## I.   Background

The following facts come from the Bureau's Complaint.  Doc. 1.  The court accepts the facts as true and views them in the light most favorable to the Bureau, as the party opposing the Motion to Dismiss.  *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1304 (10th Cir. 2020) (explaining that on a motion to dismiss the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to" the party opposing the motion (citation and internal quotation marks omitted)).

### *The Bureau's Investigation*

On January 7, 2013, James Carnes learned that the Bureau was investigating Integrity Advance, LLC—a company he controlled and ran[3]—when the Bureau served a Civil Investigation Demand (CID) on Integrity Advance.  Doc. 1 at 5 (Compl. ¶ 16).  On January 23, 2013, Integrity Advance's counsel met with the Bureau about Integrity Advance's upcoming responses to interrogatories and document requests.  *Id.* (Compl. ¶ 20).  On October 25, 2013, Integrity Advance submitted interrogatory responses and produced documents in response to the Bureau's January 7, 2013 CID.  *Id.* at 6 (Compl. ¶ 25).  These October 25, 2013, responses identified James Carnes's ownership interest in and management role at Integrity Advance.  *Id.* Integrity Advance submitted additional interrogatory responses on November 25, 2013.  *Id.*

---

After reviewing the parties' written briefs, the court finds that they explain the parties' positions sufficiently.  The court thus concludes oral argument will not assist its work and delaying the case to conduct oral argument would contradict Fed. R. Civ. P. 1.  Exercising its discretion, the court denies the request for oral argument.

[3]      Hayfield Investment Partners owned 100% of Integrity Advance.  Doc. 1 at 5 (Compl. ¶ 17).  Willowbrook Marketing, LLC was the majority owner of Hayfield Investment Partners.  *Id.*  And James Carnes owned 100% of Willowbrook Marketing, LLC.  *Id.*  James Carnes worked as one of two primary employees at Integrity Advance.  *Id.* (Compl. ¶ 18).  James Carnes also listed himself as Integrity Advance's President and Assistant Corporate Secretary.  *Id.*

(Compl. ¶ 27).  These November 25, 2013, responses disclosed that James Carnes had provided information and reviewed written responses on behalf of Integrity Advance.  *Id.*  Indeed, James Carnes was aware of and assisted in Integrity Advance's responses to the Bureau's law enforcement inquiry.  *Id.* at 8 (Compl. ¶ 38).

On October 23, 2014, the Bureau's Enforcement Counsel called James Carnes's counsel and sent counsel a Notice and Opportunity to Respond and Advise (NORA) letter to counsel.  *Id.* at 7 (Compl. ¶ 31).  This call and the NORA letter informed counsel that the Bureau's Enforcement Counsel was considering recommending that the Bureau take legal action against both Integrity Advance and James Carnes.  *Id.*  On November 17, 2015, Enforcement staff informed counsel for Integrity Advance and James Carnes that the Bureau planned to file a lawsuit against Integrity Advance and James Carnes the next day—November 18, 2015.  *Id.* (Compl. ¶ 32).

### *Funding the JRC Trust*

James Carnes is the settlor of the James R. Carnes Revocable Trust, dated February 10, 2010 (JRC Trust).  *Id.* at 6 (Compl. ¶ 22).  On January 24, 2013—the day after his counsel had met with the Bureau about responding to the CID—James Carnes applied to open an account for the JRC Trust at Wells Fargo Advisors.  *Id.* at 5 (Compl. ¶ 21).  In 2013, James Carnes used money from the sale of his payday lending business to fund the JRC Trust Wells Fargo Account. *Id.*; *id.* at 6 (Compl. ¶ 24); *id.* (Compl. ¶ 26).  To summarize these transactions:

- On February 14, 2013, the JRC Trust Wells Fargo Account received $6,412,161.76. *Id.* at 5 (Compl. ¶ 21).

- On February 25, 2013, the JRC Trust Wells Fargo Account received $2,179,806.22. *Id.*

- On September 25, 2013, the JRC Trust Wells Fargo Account received $5,226,000.00. *Id.* at 6 (Compl. ¶ 24).

- On November 18, 2013, the JRC Trust Wells Fargo Account received $3,000,142.59. *Id.* (Compl. ¶ 26).

- On December 16, 2013, the JRC Trust Wells Fargo Trust Account received $2,483,283.47. *Id.*

### *Fraudulent Transfers to the MCC Trust*

From the JRC Trust, the Bureau alleges that James Carnes made four fraudulent transfers—three transfers in 2013 and one transfer in 2015—totaling approximately $12,3000,000. James Carnes transferred the money from the JRC Trust Wells Fargo Trust Account to his wife's trust, the Melissa C. Carnes Revocable Trust dated February 10, 2010 (MCC Trust). Melissa Carnes is the settlor/grantor and co-trustee of the MCC Trust. *Id.* at 3 (Compl. ¶ 8). The Complaint identifies these allegedly fraudulent transfers in this fashion:

1. On June 3, 2013, James Carnes, as co-trustee of the JRC Trust, transferred $2,200,000.00 from the JRC Trust Wells Fargo Account to an MCC Trust Account at Stephens, Inc. ("First Transfer"). *Id.* at 6 (Compl. ¶ 23).

2. On December 5, 2013, James Carnes, as co-trustee of the JRC Trust, transferred $7,000,000.00 from the JRC Trust Wells Fargo Account to an MCC Trust Account at Stephens, Inc. ("Second Transfer"). *Id.* (Compl. ¶ 28).

3. On December 19, 2013, James Carnes, as co-trustee of the JRC Trust, transferred $3,117,325.00 from the JRC Trust Wells Fargo Account to an MCC Trust Account at Stephens, Inc. ("Third Transfer"). *Id.* at 7 (Compl. ¶ 29).

4. On November 18, 2015, James Carnes transferred $608,281.25 from the JRC Trust to an MCC Trust account at Stephens, Inc. ("Fourth Transfer"). *Id.* (Compl. ¶ 33). This transfer lists "loan repayment" as its purpose. *Id.*

These four transfers total $12,925,606.25. As discussed below, the MCC Trust later loaned $656,533.36 to the JRC Trust in 2014. Subtracting that sum, which was returned to the JRC Trust, James Carnes cumulatively transferred $12,269,072.89 to the MCC Trust between

January 2013 (when the Bureau sent a CID to Integrity Advance) and November 2015 (when the Bureau filed charges against James Carnes and Integrity Advance). *Id.* at 9 (Compl. ¶ 44).

The MCC Trust did not receive any reasonably equivalent consideration for the First, Second, or Third Transfer. *Id.* at 7 (Compl. ¶ 34). At the time of the fraudulent transfers, Integrity Advance and James Carnes unlawfully had collected millions of dollars from consumers. *Id.* (Compl. ¶ 35); *id.* at 8 (Compl. ¶ 36). And, at the time of each fraudulent transfer, the Bureau had sent a law enforcement inquiry to Integrity Advance about Integrity Advance potentially violating federal consumer finance law. *Id.* (Compl. ¶ 37). And, notably, James Carnes made the Fourth Transfer the same day that the Bureau filed its notice of charges against him and Integrity Advance. *Id.* at 7 (Compl. ¶ 33).

### *James Carnes Maintains Control Over the Transferred Assets in the MCC Trust*

James Carnes served as co-trustee of the MCC Trust. *Id.* at 2 (Compl. ¶ 2). Using the fraudulently transferred funds, James Carnes removed or concealed fraudulently transferred property by purchasing or retaining property under the name of the MCC Trust. *Id.* at 9 (Compl. ¶ 45). The following allegations illustrate James Carnes's control over the MCC Trust.

On March 14, 2014—after he had made the First, Second, and Third Transfer to the MCC Trust—James Carnes drafted a check for $656,533.36 from the MCC Trust Account at Stephens Inc. *Id.* at 7 (Compl. ¶ 30). James Carnes made the check payable to the JRC Trust, with the term "loan" written in the notes section. *Id.* The check was deposited in the JRC Trust's Wells Fargo Account. *Id.*

After making all four fraudulent transfers, James Carnes authorized payments to and from the MCC Trust to fund his own businesses and purchase vehicles, artwork, jewelry, investments, and vacation homes. *Id.* at 9 (Compl. ¶ 42). The MCC Trust holds the titles of five

5

vehicles. *Id.* at 10 (Compl. ¶ 47).  The MCC Trust owns approximately $800,000 worth of insured jewelry. *Id.* at 10–11 (Compl. ¶ 48).  The MCC Trust is the named owner of $1,380,000 of insured artwork. *Id.* at 11 (Compl. ¶ 49).  The MCC Trust has invested $1,900,000 in an array of companies and limited partnerships and James Carnes and Melissa Carnes regularly report income from these investments on their joint income tax return. *Id.* at 11–12 (Compl. ¶ 50).  On August 17, 2020, James Carnes, as co-trustee of the MCC Trust, transferred $2,706,478.64 from the MCC Trust account to purchase a property at the Yellowstone Club—a private, exclusive ski mountain in Montana. *Id.* at 12 (Compl. ¶¶ 51–52).  The MCC Trust still possesses this Yellowstone Club property. *Id.* (Compl. ¶ 51).

### James Carnes Hasn't Paid Any Money Toward His Debt

On January 11, 2021, the Bureau's Director issued a Final Order against Integrity Advance and James Carnes. *Id.* at 3–4 (Compl. ¶ 9).  The Final Order held that:  (1) Integrity Advance's loan agreement violated the Truth in Lending Act and the Consumer Financial Protection Act; (2) Integrity Advance and James Carnes engaged in deceptive and unfair practices; (3) Integrity Advance violated the Electronic Funds Transfer Act and Consumer Financial Protection Act when it conditioned credit on repayment by preauthorized electronic fund transfers; and (4) Integrity Advance and James Carnes engaged in unfair practices based on Integrity Advance's use of remotely created checks. *Id.*  The Final Order required Integrity Advance and James Carnes to pay restitution to harmed customers in the amount of $38,453,341.62 within thirty days of service of the order. *Id.* at 4 (Compl. ¶ 10).

The Bureau stayed the effective date of the Final Order to permit Integrity Advance and James Carnes to seek a stay from the Court of Appeals—the Final Order's new effective date thus was April 7, 2021. *Id.* (Compl. ¶ 11).  Neither Integrity Advance nor James Carnes sought a

stay from the Court of Appeals.  *Id.* (Compl. ¶ 12).  Both Integrity Advance and James Carnes have failed to comply with the Final Order.  *Id.*  And the Tenth Circuit affirmed the Final Order on September 15, 2022.  *Id.* (Compl. ¶ 14).  The Supreme Court denied Integrity Advance and James Carnes's petition for certiorari on June 12, 2023.[4]  *Integrity Advance, LLC v. Consumer Fin. Prot. Bureau*, 143 S. Ct. 2610 (2023) (Mem.).

When James Carnes failed to comply with the Bureau's Final Order, the Bureau sought an order and judgment from this court.  Doc. 1 at 4 (Compl. ¶ 13).  This court entered a judgment for the Bureau against Integrity Advance and James Carnes for $38,453,341.62 in restitution on July 30, 2021.  *Id.*  The judgment also includes the $7,500,000 civil penalty against Integrity Advance and the $5,000,000 civil penalty against James Carnes.  *Id.*  The Bureau propounded post-judgment discovery on James Carnes, asking about family trusts and asset transfers that occurred from January 1, 2014, to present.  *Id.* at 8 (Compl. ¶ 40).  James Carnes objected and refused to disclose any information about MCC Trust assets or transfers that occurred before October 2019—including the First, Second, Third, and Fourth Transfers.  *Id.*  The Bureau also

---

[4]      When the Bureau filed its Complaint in April 2023, this petition for a writ of certiorari remained pending before the Supreme Court.  Doc. 1 at 4 (Compl. ¶ 14).  Since, the Supreme Court has denied the petition.  The court takes judicial notice of its denial.

On a Rule 12(b)(6) motion to dismiss, the court may take judicial notice of public records without converting the motion to one for summary judgment.  *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) ("[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment.  This allows the court to take judicial notice of its own files and records, as well as facts which are a matter of public record.  However, the documents may only be considered to show their contents, not to prove the truth of matters asserted therein." (citations, brackets, and internal quotation marks omitted)); *see also* Fed. R. Evid. 201 (allowing a court to "take judicial notice at any stage of the proceeding" of "a fact that is not subject to reasonable dispute").  The Supreme Court's denial of the petition qualifies as a matter of public record that the parties cannot reasonably dispute, so the court takes judicial notice.  *See In re Lynch*, No. 01-21790 EEB, 2006 WL 3861344, at *1 (Bankr. D. Colo. Oct. 20, 2006) (taking judicial notice of denial of petition for writ of certiorari by Colorado Supreme Court).

served Rule 45 subpoenas on five financial institutions directly, requesting MCC Trust account records dating back to 2013.  *Id.* (Compl. ¶ 41).  James Carnes filed a motion to quash, arguing that transactions that occurred in 2013 were not relevant—including the First, Second, and Third Transfers.  *Id.*

Neither Integrity Advance nor James Carnes has made any payment in satisfaction of the Judgment.  *Id.* at 5 (Compl. ¶ 15).

### *This Lawsuit*

The Bureau filed this lawsuit on April 5, 2023.  *See generally id.* at 1.  The Complaint names the following defendants:

- James R. Carnes;

- Melissa C. Carnes;

- James R. Carnes, as co-trustee of the JRC Trust;

- Melissa C. Carnes, as co-trustee of the JRC Trust;

- James R. Carnes, as co-trustee of the MCC Trust;

- Melissa C. Carnes, as co-trustee of the MCC Trust.

*Id.*  The Bureau asserts one count of fraudulent transfer under the Fair Debt Collection Procedures Act against:  James Carnes; James Carnes, as co-trustee of the JRC Trust; Melissa Carnes; and Melissa Carnes as co-trustee of the MCC Trust.  *Id.* at 12–14 (Compl. ¶¶ 53–57).  The Bureau alleges that James Carnes—through the First, Second, Third, and Fourth transfer—transferred cash and investments to the MCC Trust, with actual intent to hinder, delay, or defraud a creditor, violating 28 U.S.C. § 3304(b)(1)(A).  *Id.*

The Complaint seeks several forms of relief:

- Writs of attachment, garnishment, and sequestration, and any other necessary remedy against the assets transferred or defendants' other property;

- An injunction enjoining defendants against further disposition of the fraudulently transferred property;

- A declaratory judgment that the First, Second, Third, and Fourth Transfers are fraudulent and avoidable to the extent necessary to satisfy the Bureau's judgment;

- Attachment of the fraudulently transferred property;

- Judgment liens against the fraudulent transferred property;

- Garnishment of the proceeds of the fraudulent transfers;

- Either (1) an order directing the levy and execution of the judgment by the United States Marshal after sequestering the fraudulent transfers' proceeds and applying the proceeds to the Bureau's judgment, with interests, costs, and disbursements of this action, or (2) an order appointing a receiver to identify and conduct the sale of assets held by the MCC Trust and then pay the proceeds of the sale to the Bureau in partial satisfaction of the Bureau's judgment;

- A judgment lien against 14 Double Eagle Way, Unit 7005, Big Sky, MT 59716;

- A money judgment against the MCC Trust and Melissa Carnes for the value of the property or funds received as a transferee of James Carnes's fraudulent conveyances of property.

*Id.* at 14–15 (Compl. Prayer for Relief ¶¶ 1–9).

## II.   Legal Standard

For a complaint to survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

9

When considering a Rule 12(b)(6) motion, the court must assume that the factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). And while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[,]'" which, as the Supreme Court explained, "'will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## III.    Analysis

The court first addresses the Motion to Dismiss filed by James Carnes and the JRC Trust. It then addresses Melissa Carnes's Motion to Dismiss or in the Alternative, Motion to Stay.

### A.    James Carnes and JRC Trust's Motion to Dismiss (Doc. 17)

James Carnes and the JRC Trust move to dismiss the Complaint against them for two reasons. First, James Carnes asks the court to dismiss him from the action because, he asserts, he is no longer an MCC Trust trustee. Doc. 17 at 5–6. The motion then argues that James Carnes and the JRC Trust are improper parties to this lawsuit because they transferred the assets to the MCC Trust—making them the transferors, not transferees—and the FDCPA only allows recovery from transferees. As explained below, the court finds neither argument persuasive and denies the motion under both theories.

#### 1.    No Longer a Co-Trustee

The Bureau sued (among others) "James Carnes as Co-Trustee of the Melissa C. Carnes Revocable Trust[.]" Doc. 1 at 1. In his Motion to Dismiss, James Carnes explains that Melissa Carnes has amended her trust and removed him as trustee. And, in Kansas, "the trustee is the proper person to . . . be sued on behalf of the trust." *Schaake, Tr. of Donald Dean Schaake*

*Revocable Tr. v. City of Lawrence*, 491 P.3d 1265, 1270 (Kan. Ct. App. 2021) (citing Kan. Stat. Ann. § 58a-816(24)). So, James Carnes asks the court to dismiss the portion of this lawsuit that asserts claims against him in a capacity he no longer holds. And to prove he is no longer a trustee, James Carnes attached an exhibit to his motion: a "Fourth Amendment to the Melissa C. Carnes Revocable Trust" which makes Melissa Carnes the sole acting trustee. Doc. 18-1.

The Bureau disagrees with James Carnes's arguments and takes serious issue with his exhibit. The Bureau contests the authenticity of the exhibit, calling it an "unauthenticated, unexplained attachment." Doc. 22 at 13. The court agrees with the Bureau.

This is a motion to dismiss. At the motion to dismiss stage, the court, in general, can't consider documents outside the pleadings without converting the motion to one seeking summary judgment. Fed. R. Civ. P. 12(d). Courts "have broad discretion in determining whether or not to accept materials beyond the pleadings." *Lowe v. Town of Fairland, Okla.*, 143 F.3d 1378, 1381 (10th Cir. 1998). The court can rely on documents beyond the pleadings, "thereby converting the motion, or . . . reject it or simply not consider it." 5C Charles Alan Wright, Arthur R. Miller, & Benjamin Spencer, *Federal Practice & Procedure* § 1366 (3d ed. 2023).

One exception to this general rule permits the court to avoid converting the motion to dismiss into a motion for summary judgment if the court can take judicial notice of the outside documents. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) ("[F]acts subject to judicial notice may be considered

11

in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment."). But the court can't take judicial notice of documents when the documents' authenticity is disputed. *See Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253–54 (10th Cir.2005) ("We have recognized however, that a document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute."). And "the documents may only be considered to show their contents, not to prove the truth of matters asserted therein." *Tal*, 453 F.3d at 1264 n.24 (citation, internal quotation marks, and brackets omitted).

Here, the court exercises its discretion by declining to consider James Carnes's exhibit and thereby convert this motion into one seeking summary judgment. And, because the Bureau disputes the document's authenticity, the court cannot take judicial notice of the exhibit. Even if the court did take judicial notice of the document, the court could not conclude that Melissa Carnes removed James Carnes as trustee of the MCC Trust. At the motion to dismiss stage, the court can't use the contents of the judicially noticed document to prove the truth of the matter it asserts. *Tal*, 453 F.3d at 1264 n.24. The court thus denies James Carnes's request to dismiss "James Carnes, as co-trustee of the Melissa C. Carnes Revocable Trust" because the argument relies on an exhibit that the court will not consider at this stage. *See Consumer Fin. Protection Bureau v. MacKinnon*, 569 F. Supp. 3d 162, 166 (W.D.N.Y. 2021) (denying motion to dismiss fraudulent transfer claims where defendants submitted declarations that the court could not consider under the Rule 12(b)(6) standard).

### 2.    Transferors as Proper Parties

Next, James Carnes and the JRC Trust argue that the court should dismiss them from this action because the FDCPA only applies to the transfer*ees* of a fraudulent transfer—not its

12

transfer*ors*.  James Carnes and the JRC Trust rely on two sources of authority for this argument: (1) the language and structure of the FDCPA fraudulent transfer statutes and (2) an analogy to other fraudulent transfer laws.  The court finds neither authority persuasive.

At the outset of its analysis of this argument, the court notes the novelty of James Carnes and the JRC Trust's argument.  No court has ever held—or even suggested—that a transferor is not a proper party in an FDCPA fraudulent transfer suit.  And, as explained below, this court declines to become the first.

### a.    FDCPA Fraudulent Transfer Provisions

James Carnes and the JRC Trust argue that the "text and structure of the FDCPA prove that a transferor is not a proper defendant to a fraudulent transfer claim."  Doc. 17 at 7.  They cite three FDCPA provisions as support:  28 U.S.C. §§ 3304, 3306, and 3307.  The court examines each provision, below.  But, first, because the court must interpret sections of the FDCPA, it briefly recites the principles that guide this exercise.

The court must "begin . . . with the statute's text."  *United States v. Broadway*, 1 F.4th 1206, 1211 (10th Cir. 2021).  "If the statute's text is unambiguous, then its plain meaning controls, and [the court's] inquiry ends."  *Id.*  "The plain meaning of a statute 'is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'"  *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).  With these principles in mind, the court turns to James Carnes and the JRC Trust's arguments about 28 U.S.C. §§ 3304 and 3306 together.  Then, it examines their arguments based on § 3307.

### i.    28 U.S.C. §§ 3304 and 3306

13

The Bureau's Complaint alleges a § 3304(b)(1)(A) fraudulent transfer.  Section 3304 defines the term fraudulent transfer, providing:

> Except as provided in section 3307, a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether such debt arises before or after the transfer is made or the obligation is incurred, if the debtor makes the transfer or incurs the obligation . . . (A) with actual intent to hinder, delay, or defraud a creditor[.]

28 U.S.C. § 3304(b)(1)(A).  Two notes about § 3304:  First, the words "transferor" and "transferee" never appear in § 3304—the provision refers merely to the "creditor" and "debtor." Second, the "actual intent" language in § 3304(b)(1)(A) makes the claims asserted here claims for "actual" fraudulent transfers.  The FDCPA also allows the government to pursue "constructive fraudulent transfers."  In a constructive fraudulent transfer case, the government must show that the judgment debtor

> ma[de] the transfer . . . without receiving reasonably equivalent value in exchange for the transfer or obligation if the debtor . . . was engaged in or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

28 U.S.C. § 3304(b)(1)(B); *see also id.* at § 3304(a)(1)(A).

Section 3306 identifies the government's potential remedies in a fraudulent transfer case. It "provides the Government with broad relief to recoup money lost in fraudulent transfers." *United States v. Septon*, No. 14-CV-1139 (PAM/JSM), 2016 WL 3030237, at *6 (D. Minn. May 26, 2016).  The Bureau's Complaint here explicitly invokes § 3306(a), and it provides,

> In an action or proceeding under this subchapter for relief against a transfer or obligation, the United States, subject to section 3307 and to applicable principles of equity and in accordance with the Federal Rules of Civil Procedure, may obtain—

14

(1)     avoidance of the transfer or obligation to the extent necessary to satisfy the debt to the United States;

(2)     a remedy under this chapter against the asset transferred or other property of the transferee; or

(3)     any other relief the circumstances may require.

28 U.S.C. § 3306(a).

James Carnes and the JRC Trust argue that §§ 3304 and 3306, "on their face, . . . only authorize relief against the transferee and assets in the transferee's possession." Doc. 17 at 7. This is quite a stretch. The Bureau responds—correctly, in the court's judgment—that the plain language of § 3304 does not support James Carnes and the JRC Trust's argument. Instead, § 3304 defines a fraudulent transfer, and that definition focuses on whether "the debtor ma[de] the transfer . . . with actual intent to hinder, delay, or defraud a credit." So, the debtor here—James Carnes—occupies center stage in a fraudulent transfer action.

The Bureau also takes issue with James Carnes and the JRC Trust's arguments about § 3306. The Bureau seeks avoidance of the alleged fraudulent transfers. Specifically, the Bureau's Complaint asks the court for a declaratory judgment declaring the four transfers "be adjudged fraudulent and avoidable to the extent necessary to satisfy any judgment for the Bureau, under 28 U.S.C. § 3306." Doc. 1 at 14 (Compl. Prayer for Relief ¶ 3). The Bureau asserts this remedy would reverse the fraudulent transfers and send millions back to the JRC Trust or to the Bureau. The Bureau also asserts varied, broad remedies that extend well beyond the mere avoidance of the alleged fraudulent transfers. So, this case and its remedies will affect the JRC Trust and James Carnes's interests.

The court agrees with the Bureau's arguments. First of all, and most of all, James Carnes and the JRC Trust have cited no authority supporting their interpretation of §§ 3304 and 3306.

Nor can the language of the statute support the proposition that it imposes any limits on the proper defendants in a fraudulent transfer action.  The main issue in the § 3304 inquiry is James Carnes's intent when he made the transfers at issue.  Notably, the plain text of § 3304 mentions neither transferors nor transferees—it only references the debtor.  *See* 28 U.S.C. § 3304(b)(1)(A).

Section 3306, meanwhile, provides broad forms of relief.  It allows the Bureau to seek avoidance of the transfer—an act that affects both transferors and transferees.  Avoiding the transfer could send money back to the JRC Trust.  And § 3306 allows for broad remedies, including "any other relief the circumstances may require."  28 U.S.C. § 3306(a)(3).  This broad language does not support a limit on the proper defendants to this action.  Indeed, the Bureau has invoked these broad remedies, asking the court to "[e]njoin[] defendants against further disposition of the fraudulent transferred property[.]"  Doc. 1 at 14 (Compl. Prayer for Relief ¶ 2).

In sum, the plaint text of §§ 3304 and 3306 doesn't confine the parties who are subject to relief in a fraudulent transfer action.  The court thus rejects defendants' construction to the contrary.

### ii.     28 U.S.C. § 3307

Next, James Carnes and the JRC Trust also invoke 28 U.S.C. § 3307.  It supplies possible defenses to, exceptions from, and limitations on liability arising under § 3304 and § 3306 and their remedies.  Both provisions recite that they are "subject to 3307."  As pertinent here, section 3307 provides:

> [T]o the extent a transfer is voidable in an action or proceeding by the United States under section 3306(a)(1), the United States may recover judgment for the value of the asset transferred, but not to exceed the judgment on a debt.  The judgment may be entered against—
>
> (1) the first transferee of the asset or the person for whose benefit the transfer was made; or

> (2) any subsequent transferee, other than a good faith transferee who took for value or any subsequent transferee of such good-faith transferee.

28 U.S.C. § 3307(b).  James Carnes and the JRC Trust argue that § 3307 means that "judgment on a fraudulent transfer claim under the FDCPA can only be entered against initial or subsequent transferees, not transferors."  Doc. 17 at 8.  The Bureau responds that § 3307 is an alternative remedy that doesn't apply here, so this particular argument is irrelevant.  The court agrees.

"Section 3307(b) applies where the remedies under § 3306(a) to set aside transfers and record a judgment lien are insufficient to 'undo the fraud.'"  *United States v. Brazile*, No. 4:18CV56 RLW, 2019 WL 3997394, at *3 (E.D. Mo. Aug. 23, 2019) (quoting *United States v. Sherrill*, 626 F. Supp. 2d 1267, 1275 (M.D. Ga. 2009)).  If setting aside transfers and recording a judgment lien prove insufficient, "'the only way to restore the parties to the position they occupied before the fraudulent conveyances were made is to award damages to Plaintiff and against Defendant.'"  *Id.* (brackets omitted) (first quoting *Sherrill*, 626 F. Supp. 2d at 1275; then citing *Septon*, 2016 WL 3030237, at *6–7 (ordering money judgment against transferee ex-wife because husband and wife had spent all the money at issue, so "the Government's only remedy [was] a money judgment against [transferee ex-wife], which [would] allow the Government to proceed against [transferee ex-wife's] other property")).

James Carnes and the JRC Trust are mistaken when they suggest that § 3307 confines *every* kind of claim in every fraudulent transfer action.  If the money has disappeared, section 3307(b) provides that the Bureau "may recover judgment for the value of the asset transferred[.]"  28 U.S.C. § 3307(b).  Note the permissive "may" in this provision—it provides an option.  That is, when the Bureau pursues that kind of judgment, § 3307(b) provides defenses to good faith transferees.  Section 3306 permits broad remedies, of course, but by itself, it doesn't protect good

17

faith transferees.  Similarly, § 3304 defines fraudulent transfers, but doesn't protect good faith transferees.  So, with § 3307, Congress sought to protect good faith transferees from § 3304 liability and § 3306 remedies if—and only if—the government sought an alternative remedy under § 3307.

Here, the Bureau has not pursued a § 3307 remedy, at least not yet.  *See generally* Doc. 1. So, James Carnes and the JRC Trust's reliance on this provision is misplaced.  And it certainly does not provide them with immunity to the claims asserted in this suit.[5]

### b.      Analogizing to Other Fraudulent Transfer Laws

James Carnes and the JRC Trust make another argument for dismissal that analogizes the FDCPA to the Uniform Fraudulent Transfer Act (UFTA) and the bankruptcy code.  They argue that the UFTA and the bankruptcy code prohibit fraudulent transfer claims against transferors. Doc. 17 at 8.  And, they claim, the relevant UFTA and bankruptcy code provisions resemble the FDCPA, so the court should apply the same rule in this action.

This argument misapprehends the FDCPA.  As demonstrated above, nothing in that act confines the remedies it recognizes to transferees.  Indeed, the plain language of the key

---

[5]      The court bases this conclusion on the unambiguous, plain text of § 3307.  So, it can end its inquiry here.  *Broadway*, 1 F.4th at 1211.  But James Carnes and the JRC Trust also make a Congressional intent argument based on the FDCPA as a whole.  They argue that it's significant that § 3307 does not mention "judgment debtors" or "transferors" because, elsewhere, the FDCPA *does* provide for remedies against debtors and transferors.  Doc. 26 at 2 (citing 28 U.S.C. §§ 3201–06).  So, they argue, Congress must have intentionally omitted transferors from the statutory scheme for fraudulent transfer liability.

This argument is based on the mistaken premise that § 3307 applies in every FDCPA fraudulent transfer action.  As explained above, this simply is wrong.  Section 3307 provides an alternative remedy. And the court cannot glean any Congressional intent from § 3307's mention of transferees.  As the Bureau explains, "Section 3307(b) refers to transferees because it provides a defense to certain transferees against whom a money judgment is sought; it makes no reference to transferors because it does not apply to transferors."  Doc. 22 at 10.  So, the court declines to draw any inferences from Congress omitting transferors from § 3307.

provisions in this act authorizes liability against a "debtor."  Section 3304 defines an actual intent fraudulent transfer action with reference solely to a debtor—"a transfer made or obligation incurred by a *debtor* is fraudulent as to a debt to the United States . . . if the *debtor* makes the transfer or incurs the obligation . . . with actual intent to hinder, delay, or defraud a creditor[.]" 28 U.S.C. § 3304(b)(1)(A) (emphases added).  In other words, the term "debtor" in this context is simply another way to refer to an alleged fraudulent transferor.  So, even if the UFTA and the bankruptcy code prohibit fraudulent transfer claims against transferors—as James Carnes and the JRC Trust assert—they aren't analogous to the FDCPA.

Faulty premise aside, the UFTA and bankruptcy code do not provide a good analogy for FDCPA fraudulent transfer actions like this one.  Naturally, the UFTA and the bankruptcy code contain fraudulent transfer provisions with language like the FDCPA's fraudulent transfer provisions.  *See, e.g.*, *In re Walter*, 462 B.R. 698, 705–06 (Bankr. N.D. Iowa 2011) (identifying legal standards for constructive fraudulent conveyance under FDCPA, Iowa fraudulent transfer law and noting similarities to determine whether bankruptcy trustee's Complaint satisfied Rule 12(b)(6) standard).  So, courts sometimes use fraudulent transfer law and the bankruptcy code to interpret the FDCPA.  But the cases that James Carnes and the JRC Trust cite for this analogy don't help their argument.

Most of the cases that James Carnes and the JRC Trust cite deal with a different kind of fraud—constructive fraud, not the actual fraud alleged here.  And those cases do not use fraudulent transfer law or the bankruptcy code to decide the proper parties to the suit.  Instead, those cases use state fraudulent transfer law or the bankruptcy code to define a term that is not defined in the FDCPA—specifically, the term "reasonably equivalent value" used in the definition of constructive fraud.  *See United States v. Osborne*, 807 F. App'x 511, 520–21 (6th

19

Cir. 2020) (looking to Michigan law's definition of fraudulent transfer for definition of "reasonably equivalent value" to define "reasonably equivalent value" in constructive fraudulent transfer statute, 28 U.S.C. § 3304(b)(1)(B)); *United States v. Goforth*, 465 F.3d 730, 735–36 (6th Cir. 2006) (using bankruptcy code's definition of "reasonably equivalent value" to define the term in an FDCPA constructive fraud action brought under 28 U.S.C. § 3304(a)(1)(A)); *VanCampen v. United States ex rel. Internal Revenue Serv.*, No. Civ. A. 95-1436-FGT, 1997 WL 873537, at *4 (D. Kan. 1997) (using bankruptcy code's definition of "reasonably equivalent value" to define "reasonably equivalent value" in constructive fraud action brought under 28 U.S.C. § 3304(a)(1)(A)).  These cases and their controversies about the definition of "reasonably equivalent value" simply don't support James Carnes and the JRC Trust's argument that they are improper parties to this suit.  And none of the cited cases involve the fraudulent transfer provision at issue here:  actual fraud under 28 U.S.C. § 3304(b)(1)(A).

The court also doesn't find James Carnes and the JRC Trust's analogy persuasive because a bankruptcy analogy doesn't fit here.  As the Bureau mentions, the bankruptcy code seeks "to ensure the equitable distribution of a debtor's assets to creditors."  Doc. 22 at 10 n.5.  Consider the structure of a bankruptcy fraudulent transfer action:  the trustee, on behalf of the debtor's estate, sues transferees to "recover, for the benefit of the estate, the property transferred, or . . . the value of such property, from" transferees.  11 U.S.C. § 550.  In essence, a representative, acting on behalf of the transferor, sues the transferee to reclaim the transferor's asset.  *See, e.g.*, *Generation Res. Holding Co. v. Spencer Fane LLP*, 964 F.3d 958, 963–96 (10th Cir. 2020) (describing circumstances leading bankruptcy trustee for debtor—Generation Resources—to bring bankruptcy estate's claim remedying Generation Resource's fraudulent

transfer); *Seitter v. Schoenfeld*, 88 B.R. 343, 345 (Bankr. D. Kan. 1988) (noting that the debtor, acting through the bankruptcy trustee, brought the fraudulent transfer suit against transferees).

Not so in this FDCPA fraudulent transfer action. The transferor isn't automatically involved through the bankruptcy trustee. A representative of the debtor-transferor hasn't sued the transferees for the benefit of creditors. Instead, here, the government has sued all parties involved in the alleged fraudulent transfer, aiming to collect its debt under the FDCPA.[6]

James Carnes and the JRC Trust's best argument lies in *In re Terra Bentley II, LLC*, No. 09-23107-11, 2011 WL 671753 (Bankr. D. Kan. Feb. 17, 2011). There, in a bankruptcy proceeding, a creditor sued defendants under the Kansas Uniform Fraudulent Transfer Act seeking to avoid a second mortgage that the debtor had given to another creditor. *Id.* at *1. The defendants "allegedly caused the Debtor to give the mortgage" but defendants did not receive any of the property transferred or receive any benefit from the transfer. *Id.* Nonetheless, the creditor sued defendants for fraudulent transfer and relied on Kan. Stat. Ann. § 33-207(a)(3)(C), which, like 28 U.S.C. § 3306(a)(3), authorized "any other relief the circumstances may require." *Id.* at *5. Defendants moved to dismiss the claim because "none of them [were] transferors, transferees, beneficiaries, or subsequent transferees of the mortgage that [the creditor was] trying to avoid." *Id.* at *2. The bankruptcy court granted the motion to dismiss. The court explained that the "any other relief the circumstances may require" language of the Kansas Uniform Fraudulent Transfer Act "does not invite courts to craft remedies against persons involved in an avoidable transfer, but only additional remedies against the transfers, obligations, or assets involved." *Id.* at *4–5.

---

[6] The Bureau correctly points out that in every FDCPA case cited by James Carnes and the JRC Trust, the government named the transferor as a defendant.

James Carnes and the JRC Trust seem to believe that the holding in *Terra Bentley II* means that the Bureau only can pursue an *in rem* remedy against the transferred property. Doc. 26 at 3. No court has ever held that transferors are immune from suit under the FDCPA's fraudulent transfer provisions. Indeed, *Terra Bentley II*'s defendants moved to dismiss because they were neither transferors nor transferees. 2011 WL 671753, at *2. So *Terra Bentley II* doesn't address whether transferors are proper parties to a fraudulent transfer suit.

And the Bureau doesn't merely seek to avoid the fraudulent transfers. The Bureau also asks the court to "[e]njoin[] defendants against further disposition of the fraudulent transferred property." Doc. 1 at 14 (Compl. Prayer for Relief ¶ 2). An "injunction is a judicial process or mandate operating *in personam*." *Nken v. Holder*, 556 U.S. 418, 428 (2009) (citation and internal quotation marks omitted); *see also Almeida v. N.A.R., Inc.*, No. 2:22-cv-423-DAK-DAO, 2022 WL 17811402, at *4 (D. Utah Dec. 19, 2022) ("[W]hen the judgment sought is for the recovery of money or for an injunction compelling or restraining action by the defendant then the judgment sought is strictly *in personam*." (citation and internal quotation marks omitted)). Thus, the Bureau seeks more than just an *in rem* remedy against the fraudulent transferred property. It seeks an *in personam* remedy against each defendant—including James Carnes and the JRC Trust. As a result, they are proper defendants in this action.

The court denies James Carnes and the JRC Trust's Motion to Dismiss (Doc. 17).

### B.  Melissa Carnes's Motion to Dismiss

Melissa Carnes also has filed a Motion to Dismiss or in the Alternative, Motion to Stay (Doc. 19). Melissa Carnes first asserts that the FDCPA's statute of limitations bars the Bureau's claims. And, like James Carnes and the JRC Trust, Melissa Carnes argues that she is an improper defendant in her capacity as co-trustee of the JRC Trust because the Bureau can only

bring FDCPA claims against transferees.  Alternatively, Melissa Carnes asks that the court stay this case pending the outcome of two Supreme Court cases.  The court addresses each argument in turn and, for the reasons explained below, denies the Motion to Dismiss and declines to stay the case.

### 1.   Statute of Limitations

Melissa Carnes argues that the court must dismiss the Bureau's Complaint because the FDCPA's statute of limitations has expired.  Before the court addresses the merits of this argument, it recites the legal standard governing dismissal on statute of limitations grounds under Fed. R. Civ. P. 12(b)(6).  Then, it applies this standard.

The Federal Rules of Civil Procedure distinguish between defenses and affirmative defenses.  *Compare* Fed. R. Civ. P. 8(b) ("Defenses; Admissions and Denials"), *with* Fed. R. Civ. P. 8(c) ("Affirmative Defenses").  Federal Rule of Civil Procedure 12(b) authorizes a party to assert by motion certain defenses, including that the claimant "fail[s] to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).

"The statute of limitations is an affirmative defense that must be raised by the defendant." *Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022) (citation omitted); *see also* Fed. R. Civ. P. 8(c)(1).  The court properly can dismiss a "claim on the pleadings based on an affirmative defense . . . only when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements." *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018).  "Typically, facts must be developed to support dismissing a case based on the statute of limitations." *Herrera*, 32 F.4th at 991.  But the court can resolve a statute of limitations defense "on a Rule 12(b) motion when the dates given in the complaint make it clear that the right sued upon has been extinguished." *Id.* (citation and internal quotation

marks omitted).  When the case raises questions about when the plaintiff discovered fraud, if "the answer is apparent on the fact of the complaint, this issue may be resolved on a motion to dismiss." *Dummar v. Lummis*, 543 F.3d 614, 619 (10th Cir. 2008).

Here, the Bureau brings this fraudulent transfer action under 28 U.S.C. § 3304(b)(1)(A). Doc. 1 at 12–14 (Compl. ¶¶ 53–57).  The FDCPA requires a claimant to bring a § 3304(b)(1)(A) claim "within 6 years after the transfer was made or the obligation was incurred or, if later, within 2 years after the transfer or obligation was or could reasonably have been discovered by the claimant[.]"  28 U.S.C. § 3306(b)(1)(A).

Recall the dates of the four allegedly fraudulent transfers:

- **First Transfer:**  June 3, 2013.  Doc. 1 at 6 (Compl. ¶ 23).

- **Second Transfer:**  December 5, 2013.  *Id.* (Compl. ¶ 28).

- **Third Transfer:**  December 19, 2013.  *Id.* at 7 (Compl. ¶ 29).

- **Fourth Transfer:**  November 18, 2015.  *Id.* (Compl. ¶ 33).

The Bureau filed this lawsuit on April 5, 2023.  *See generally id.*  Melissa Carnes argues the obvious—these four transfers fall well outside the six-year window provided by the FDCPA's statute of limitations.  And Melissa Carnes argues that the Bureau cannot use the FDCPA's two-year discovery rule because "the Complaint does not allege when Plaintiff discovered, or reasonably could have discovered, each of the four transfers."  Doc. 19 at 7. Thus, Melissa Carnes argues, "the Complaint does not sufficiently plead the timeliness of Plaintiff's claim."  *Id*

The Bureau responds that Melissa Carnes has flipped the burden.  It asserts that it does not need to allege Melissa Carnes's affirmative defense for her.  Doc. 23 at 6.  Instead, Melissa Carnes "points to no allegation in the Complaint that relates to this action's timeliness under the

24

two-year limitation period, let alone something in the Complaint that would 'admit[] all the elements of the affirmative defense by alleging the factual basis for those elements.'" *Id.* (quoting *Fernandez*, 883 F.3d at 1299). The Bureau has it right.

Our Circuit prescribes a simple test to apply at this stage, the earliest stage in the litigation: Does the Complaint, on its face, appear untimely? Here, the answer is no. The Complaint alleges that the Bureau's Final Order against Integrity Advance and James Carnes went into effect on April 7, 2021. Doc. 1 at 4 (Compl. ¶¶ 10–11). The Complaint also alleges that this court entered judgment on July 30, 2021. *Id.* (Compl. ¶ 13). And the Complaint alleges that the Bureau propounded post-judgment discovery, to which James Carnes "objected and refused to disclose any information concerning the assets of the MCC Trust and any transfers that occurred prior to October 2019, including the First, Second, Third, and Fourth Transfers." *Id.* at 8 (Compl. ¶ 40). The Complaint alleges enough facts to allow "the court to draw the reasonable inference that" the Bureau discovered the four fraudulent transfers on some date after the Bureau's Final Order on April 7, 2021. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). So, this April 5, 2023, action falls with the FDCPA's two-year statute of limitations. The court thus denies Melissa Carnes's Motion to Dismiss (Doc. 19) based on her statute of limitations argument.[7]

---

[7] The parties made some additional arguments about timeliness that the court declines to consider here. In her Reply, Melissa Carnes argued that the Bureau failed to meet the heightened pleading requirements of Fed. R. Civ. P. 9(b) for fraud actions. Doc. 29 at 3. Generally, the court doesn't consider arguments raised for the first time in a reply. *See Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1288 (10th Cir. 2003) (holding that an argument raised for the first time in a reply brief is waived (citation omitted)); *see also Nat'l R.R. Passenger Corp. v. Cimarron Crossing Feeders, LLC*, No. 16-1094-JTM-TJJ, 2018 WL 489100, at *1 (D. Kan. Jan. 19, 2018) ("[T]he Court will not consider arguments raised for the first time in a reply brief, particularly where the arguments could have been made in the first instance."). Because Melissa Carnes raises this argument for the first time in her Reply and the Bureau thus hasn't had an opportunity to respond to it, the court declines to consider it.

2.      **Transferor Liability**

Melissa Carnes argues that the court should dismiss her "in her capacity as co-trustee of the JRC Trust because the JRC Trust is the transferor, and therefore not a proper party to Plaintiff's FDCPA claim." Doc. 19 at 7.  The court rejected this argument in the portion of this Order deciding the same argument by James Carnes and the JRC Trust. *Supra* § III.A.2.  The same reasoning applies to Melissa Carnes's version of it.  The court thus denies Melissa Carnes's Motion to Dismiss.

3.      **Motion to Stay**

As an alternative remedy, Melissa Carnes asks the court to stay this case until the Supreme Court resolves two cases:

1.  James Carnes's petition for writ of certiorari in *Integrity Advance, LLC v. Consumer Financial Protection Bureau*;

2.  *Consumer Financial Protection Bureau v. Community Financial Services Association of America, Limited*, a challenge to the Bureau's funding, which the Supreme Court will take up in its October 2023 sitting.  143 S. Ct. 978 (2023).

A district court "has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706–07 (1997).  The "right to proceed in court should not be denied except under the most extreme circumstances." *Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.*, 713 F.2d 1477, 1484 (10th Cir. 1983) (citation and internal quotation marks omitted).  "When discharging its discretion, the Court must weigh competing interests and maintain an even balance." *Kramer v. Textron Aviation,*

---

And, during a hearing in this case, the Bureau argued that the case is timely based on an equitable tolling theory.  The Bureau didn't raise this argument in its Response to Melissa Carnes's Motion to Dismiss. *See generally* Doc. 23.  The court ordered the Bureau to submit its authority for this equitable tolling theory, and the Bureau complied.  Doc. 56.  Melissa Carnes responded.  Doc. 60.  But the court need not reach the Bureau's equitable tolling theory because the Complaint does not, on its face, appear untimely.

*Inc.*, No. 20-2341-HLT-GEB, 2021 WL 4902249, at *3 (D. Kan. Oct. 21, 2021) (citation and internal quotation marks omitted).  "In the District of Kansas, courts have examined five factors when weighing the parties' competing interests to determine whether a stay is appropriate:

(1) plaintiffs' interests in proceeding expeditiously with the action and the potential prejudice to plaintiffs of a delay;

(2) the burden on defendants;

(3) the convenience to the court;

(4) the interests of persons not parties to the litigation; and

(5) the public interest."

*Id.* (citation and internal quotation marks omitted).

As noted above, the Court denied James Carnes's petition for a writ of certiorari.  *See supra* § I.  So, the first request for stay is moot.  As for the second request, Melissa Carnes fails to present "the most extreme circumstances" required for a stay.  *Commodity Futures Trading Comm'n*, 713 F.2d at 1484 (citation and internal quotation marks omitted).  The pending case before the Supreme Court may affect this case.  Or it may not.  But the balance of interests does not favor a stay.

The court gives significant weight to the Bureau's interests against a stay.  This court entered a judgment against James Carnes and Integrity Advance, LLC more than two years ago.  Apparently, James Carnes has paid none of his obligations under this judgment.  Instead, the Bureau alleges, James Carnes has tried to thwart or delay the Bureau's efforts to collect.  And the Bureau alleges that James Carnes made four fraudulent transfers to Melissa Carnes's trust as part of this effort to thwart or delay.  The Bureau also expresses its concern that a stay would give

defendants more time to hide or dissipate assets. The court is concerned that a stay would help James Carnes in his efforts to thwart or delay the Bureau's efforts to collect a valid judgment.

The court assigns little weight to the burden on defendants in this case. James Carnes could have eliminated the need for this lawsuit—and the burden on defendants. They simply could pay the judgment.

Last, the court considers the interests of persons nor parties to the litigation and the public interests in the case. The Bureau seeks to recover funds for the benefit of consumers injured by James Carnes and Integrity Advance's illegal payday lending scheme. A stay would delay these restitution efforts.

The court, in its discretion, declines to stay the case.

## IV.    Conclusion

For the reasons stated in this Memorandum and Order, the court denies James Carnes and the JRC Trust's Motion to Dismiss (Doc. 17). The court also denies Melissa Carnes's Motion to Dismiss or in the Alternative, Motion to Stay (Doc. 19).

**IT IS THEREFORE ORDERED BY THE COURT THAT** James Carnes and the JRC Trust's Motion to Dismiss (Doc. 17) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** Melissa Carnes's Motion to Dismiss or in the Alternative, Motion to Stay (Doc. 19) is denied.

**IT IS SO ORDERED.**

**Dated this 20th day of September, 2023, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**