## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CONSUMER FINANCIAL
PROTECTION BUREAU,

              **Plaintiff,**

    **v.**

JAMES R. CARNES, et al.,

              **Defendants.**

**Case No. 23-2151-DDC-TJJ**

## MEMORANDUM AND ORDER

The Consumer Financial Protection Bureau has secured a judgment against James Carnes for over $43 million.  James Carnes hasn't satisfied that judgment.  The Bureau brings this fraudulent transfer action as part of its efforts to collect its judgment, alleging that James Carnes fraudulently transferred millions to his wife's trust.

When the United States brings an action against a debtor who owes a debt to the United States, the law allows the United States to seek prejudgment remedies under certain circumstances.  These prejudgment remedies "ensure that debtors cannot wreak havoc to the Government's efforts to collect on a probably valid debt."  *United States v. Stabl Inc.*, No. 16CV233, 2018 WL 6068424, at *6 (D. Neb. Nov. 19, 2018) (internal quotation marks omitted). The Bureau invoked these prejudgment remedies here and applied, ex parte, for prejudgment writs of garnishment and attachment against property in a trust to prevent defendants from assigning, disposing, removing, concealing, or wasting the trust's assets.  The court granted the application and issued the writs.

James Carnes filed a Motion to Quash (Doc. 38) the writs, arguing he is no longer a trustee of the trust at issue.  The court grants the motion.  Melissa Carnes also filed a Motion to

Quash (Doc. 37), arguing the Bureau has failed to meet the relevant legal standards for a prejudgment remedy. The court disagrees with her arguments and denies her motion. The court explains these decisions, below. But, first, it begins with the facts underlying this fraudulent transfer action.

## I.    Factual Background

Before the forthcoming flood of facts about alleged fraudulent transfers, it helps to know what the Bureau looks for in financial investigations. Here, the Bureau brings a fraudulent transfer claim under the Fair Debt Collection Practices Act, alleging that James Carnes made four fraudulent transfers "with actual intent to hinder, delay, or defraud a creditor[,]" violating 28 U.S.C. § 3304(b)(1)(A). Doc. 1 at 12. The Bureau relies on circumstantial evidence to show the requisite "actual intent." *See United States v. Sherrill*, 626 F. Supp. 2d 1267, 1272 (M.D. Ga. 2009) ("Because of the difficulty of producing direct proof of fraud, circumstantial evidence can be sufficient to establish an intent to defraud.") (citing 37 Am. Jur. 2d. *Fraudulent Conveyances and Transfers* § 202 (2009)). And the FDCPA itself provides a list of 11 factors—so-called "badges of fraud"—that courts should consider when evaluating circumstantial evidence of "actual intent." 28 U.S.C. § 3304(b)(2); *see also In re Kelsey*, 270 B.R. 776, 782 (B.A.P. 10th Cir. 2001) ("Intent to hinder, delay, or defraud creditors is rarely admitted by a debtor. Therefore, a court may consider circumstantial evidence establishing badges of fraud."). Here, the Bureau identifies six circumstances that—in its judgment—qualify as badges of fraud:

- Whether "the transfer or obligation was to an insider;"

- Whether "the debtor retained possession or control of the property transferred after the transfer;"

- Whether "the transfer or obligation was disclosed or concealed;"

- Whether "before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;"

- Whether "the debtor removed or concealed assets;" and

- Whether "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred[.]"

28 U.S.C. § 3304(b)(2)(A)–(D), (G)–(H).

With this backdrop, the court turns to the current generation of facts in the record.

### *The Bureau's Investigation*

The Bureau asserts that James Carnes had notice of his potential liability in 2012, based on the Federal Trade Commission's suit against Scott Tucker—who, according to the Bureau, ran a similar payday lending operation. Specifically, in April 2012, the Federal Trade Commission filed suit in the District of Nevada, alleging that AMG Services, Inc. and Scott Tucker had violated the Federal Trade Commission Act by engaging in deceptive acts and practices. Doc. 33-1 at 5 (Nolan Aff. ¶ 12). The FTC's suit sought to hold Tucker personally liable. *Id.* In the Bureau's view, AMG Services used a loan agreement similar to Integrity Advance's loan agreement. *Id.* Integrity Advance was James Carnes's payday lending business. And, in the Bureau's view, Integrity Advance and James Carnes continued their practices unabated after the FTC lawsuit. *Id.*

The Bureau served a Civil Investigative Demand (CID) on Integrity Advance on January 7, 2013. *Id.* (Nolan Aff. ¶ 13); Doc. 33-2 at 11–51 (Attach. 2). Integrity Advance's counsel met with Bureau enforcement staff on January 23, 2013. Doc. 33-1 at 5 (Nolan Aff. ¶ 14); Doc. 33-3 at 1–7 (Attach. 3). The next day, January 24, James Carnes began setting up a Wells Fargo

Advisors account[1] for the James R. Carnes Revocable Trust (JRC Trust).  Doc. 33-1 at 6 (Nolan Aff. ¶ 15); Doc. 33-3 at 9 (Attach. 4).

Integrity Advance made its first production in response to the Bureau's CID on October 25, 2013.  Doc. 33-1 at 7 (Nolan Aff. ¶ 20).  In this October 25 production, Integrity Advance identified James Carnes as one of its two officers.  Doc. 33-1 at 6 (Nolan Aff. ¶ 16); Doc. 33-3 at 19 (Attach. 5).  Specifically, James Carnes was President and Assistant Secretary of Integrity Advance.  Doc. 33-1 at 6 (Nolan Aff. ¶ 16); Doc. 33-3 at 19 (Attach. 5).  In Integrity Advance's November 25, 2013, CID response, Integrity Advance identified James Carnes as a person who participated in responding to the CID by providing information and reviewing written responses. Doc. 33-1 at 7 (Nolan Aff. ¶ 20); Doc. 33-3 at 4–5 (Attach. 10).

Integrity Advance was a wholly owned subsidiary of Hayfield Investment Partners.  Doc. 33-1 at 6 (Nolan Aff. ¶ 18).  On February 14, 2013, and February 25, 2013, Hayfield made two separate wire transfers to the JRC Wells Fargo Account, totaling $8,591,967.98.  *Id.* (Nolan Aff. ¶ 17); Doc. 33-4 at 21–23 (Attach. 6).

### *Alleged Fraudulent Transfers*

The Bureau alleges that James Carnes made four fraudulent transfers, starting in June 2013.  On June 3, 2013, the JRC Trust transferred $2,200,000 from its Wells Fargo account to an account[2] for the Melissa C. Carnes Revocable Trust (MCC Trust) at Stephens, Inc. ending in 2821.  Doc. 33-1 at 6 (Nolan Aff. ¶ 19); Doc. 33-3 at 25–26 (Attach. 7); Doc. 33-3 at 28–29

---

[1]	Wells Fargo issued an account number for the new account, ending in 1636.  Doc. 33-1 at 6 (Nolan Aff. ¶ 15); Doc. 33-3 at 9 (Attach. 4).  This Memorandum and Order refers to this account as the JRC Wells Fargo Account.

[2]	The court refers to the MCC Trust's account at Stephens—which has changed account numbers a few times—as the MCC Stephens Account.

(Attach. 8).  The court refers to this transfer as the "First Transfer."  James Carnes authorized this First Transfer.  Doc. 33-1 at 6–7 (Nolan Aff. ¶ 19); Doc. 33-4 at 2 (Attach. 9).

Both the second and third allegedly fraudulent transfers occurred in December 2013.  On December 5, 2013, the JRC Wells Fargo Account transferred $7,000,000 to the MCC Stephens Account.  Doc. 33-1 at 7 (Nolan Aff. ¶ 21); Doc. 33-4 at 7–8 (Attach. 11); *Id.* at 10–11 (Attach. 12).  The court refers to this transfer as the "Second Transfer."  On December 19, 2013, the JRC Wells Fargo Account transferred $3,117,325 to the MCC Stephens Account.  Doc. 33-1 at 7 (Nolan Aff. ¶ 21); Doc. 33-4 at 7–8 (Attach. 11); *Id.* at 10–11 (Attach. 12).  The court refers to this transfer as the "Third Transfer."  James Carnes authorized both the Second and Third Transfers.  Doc. 33-1 at 7 (Nolan Aff. ¶ 21); Doc. 33-4 at 13 (Attach. 13); *Id.* at 15 (Attach. 14).

The next transfer occurred almost two years later.  On November 18, 2015, the JRC Wells Fargo Account transferred $608,281.25 to the MCC Stephens Account.  Doc. 33-1 at 8 (Nolan Aff. ¶ 23); Doc. 33-4 at 17–18 (Attach. 15); *Id.* at 20–21 (Attach. 16).  The court refers to this transfer as the "Fourth Transfer."  James Carnes authorized this transfer.  Doc. 33-1 at 8 (Nolan Aff. ¶ 23); Doc. 33-4 at 23 (Attach. 17).  The letter of authorization provides that the purpose of the transfer was "Loan repayment."  Doc. 33-1 at 8 (Nolan Aff. ¶ 23); Doc. 33-4 at 23 (Attach. 17).

### *James Carnes Controls the MCC Trust Accounts*

The Bureau alleges that James Carnes controlled the fraudulently transferred funds once the money made it to the MCC Trust.  The Bureau's affiant provides that James Carnes used the MCC Trust accounts "to make payments to his businesses, private investments, and himself."  Doc. 33-1 at 8 (Nolan Aff. ¶ 24).  The Bureau cites the following transactions as evidence of James Carnes's control over the MCC Trust.  The court lists these transactions in the following sequence:  transactions to LLCs where James Carnes is a manager and member; transactions

made to purchase a membership interest or to invest; checks written to James Carnes or Melissa Carnes or to the JRC Trust from the MCC Stephens Account; and transactions made to purchase personal or real property.

**Blitztrade, LLC:**  In January 2014, James Carnes initiated a wire transfer of $350,000 from the MCC Stephens Account to Blitztrade, LLC.  Doc. 33-1 at 8 (Nolan Aff. ¶ 25); Doc. 33-4 at 25 (Attach. 18).  James Carnes also drafted two checks of $100,000 each, dated in September 2015 and October 2015, from the MCC Trust Stephens Account to Blitztrade.  Doc. 33-1 at 8 (Nolan Aff. ¶ 25); Doc. 33-4 at 26–27 (Attach. 18).  James Carnes is a manager and member of Blitztrade.  Doc. 33-1 at 8 (Nolan Aff. ¶ 25); Doc. 33-4 at 31 (Attach. 19).  And James Carnes is the account signatory on Blitztrade's bank account.  Doc. 33-1 at 8 (Nolan Aff. ¶ 25); Doc. 33-4 at 29–31 (Attach. 19).

**Willowbrook Marketing, LLC:**  In October 2015, James Carnes drafted a check for $129,281.25 from the MCC Stephens Account to Willowbrook Marketing, LLC with the term "loan" in the notes section.  Doc. 33-1 at 9 (Nolan Aff. ¶ 26); Doc. 33-4 at 33 (Attach. 20).  The check was deposited in Willowbrook Marketing's account at First National Bank of Louisburg.  Doc. 33-1 at 9 (Nolan Aff. ¶ 26); Doc. 33-4 at 35 (Attach. 21).  James Carnes is a manager and member of Willowbrook Marketing and he was the account signatory on Willowbrook Marketing's account at the First National Bank of Louisburg.  Doc. 33-1 at 9 (Nolan Aff. ¶ 26); Doc. 33-4 at 37 (Attach. 22); *Id.* at 38–44 (Attach. 22).

**Mer-Sea, LLC & Co.:**[3]  On January 15, 2016, the MCC Stephens Account sent a check for $500,000 to Mer-Sea, LLC & Co. to purchase a membership interest.  Doc. 33-1 at 9 (Nolan

---

[3]      Ms. Nolan's affidavit refers to this entity as "Mer-Sea, LLC & Co."  Doc. 33-1 at 9 (Nolan Aff. ¶ 27).  The underlying document refers to "Mer-Sea & Co., LLC."  Nolan Aff. at 62 (Attach. H), *Consumer Financial Protection Bureau v. Integrity Advance, LLC*, No. 21-mc-206, ECF No. 136-1 at 62. To mitigate any confusion this discrepancy, the court uses Ms. Nolan's term.

Aff. ¶ 27); Nolan Aff. at 62 (Attach. H), *Consumer Financial Protection Bureau v. Integrity Advance, LLC*, No. 21-mc-206, ECF No. 136-1 at 62; Nolan Aff. at 66 (Attach. I), *Consumer Financial Protection Bureau v. Integrity Advance, LLC*, No. 21-mc-206, ECF No. 136-1; *Id.* at 68 (Attach. I).  James Carnes also wrote a letter of personal guaranty for Mer & Sea for $500,000.  Nolan Aff. at 62 (Attach. H), *Consumer Financial Protection Bureau v. Integrity Advance, LLC*, No. 21-mc-206, ECF No. 136-1 at 62.

**Deeyook II, LLC:**  On June 22, 2020, James Carnes initiated a wire transfer of $100,000 from the MCC Stephens Account to Deeyook II, LLC.  Doc. 33-1 at 10 (Nolan Aff. ¶ 28); Doc. 33-4 at 46 (Attach. 23); *Id.* at 49 (Attach. 24).  The MCC Trust thus invested in Deeyook II, LLC.  Doc. 33-4 at 51–54 (Attach. 25).  As context, James Carnes made this transfer during the late stages of the administrative litigation brought by the Bureau.  Doc. 33-1 at 10 (Nolan Aff. ¶ 28).

**BioDaf USA, Inc.:**  On September 2, 2020, James Carnes initiated a wire transfer of $100,000 from the MCC Stephens Account to purchase stock in BioDaf USA, Inc.  *Id.* (Nolan Aff. ¶ 29); Doc. 33-4 at 56 (Attach. 26); *Id.* at 59 (Attach. 27); *Id.* at 61–63 (Attach. 28).  To place this transfer on the timeline:  it occurred about a month after the ALJ issued her recommended decision against James Carnes.  Doc. 33-1 at 10 (Nolan Aff. ¶ 29).

**Checks:**  Between January 2014 and June 2022, Melissa Carnes, as co-trustee, drafted one check to James Carnes for $100,000 from the MCC Stephens Account.  *Id.* (Nolan Aff. ¶ 30); Doc. 33-4 at 65 (Attach. 29).  During this same timeframe, James Carnes, as co-trustee, drafted 28 checks to himself from the MCC Stephens Account.  Doc. 33-1 at 10 (Nolan Aff. ¶ 30); Doc. 33-4 at 65 (Attach. 29).  Those 28 checks ranged in value from $30,000 to $200,000, and they totaled $2 million.  Doc. 33-1 at 10 (Nolan Aff. ¶ 30); Doc. 33-4 at 65 (Attach. 29).  In

contrast, Melissa Carnes wrote five checks to herself during this period, for a total of $340,000. Doc. 33-1 at 10 (Nolan Aff. ¶ 30); Doc. 33-4 at 67 (Attach. 30).

**Loan to JRC Trust:**  In March 2014, James Carnes drafted a check for $656,533.36 from the MCC Stephens Account to the JRC Trust with the term "loan" in the notes section. Doc. 33-1 at 11 (Nolan Aff. ¶ 32); Doc. 33-4 at 69 (Attach. 31); *Id.* at 71–72 (Attach. 32).

**Jewelry:**  In June 2014, James Carnes drafted a check to Tiffany & Co. for $662,000 to purchase jewelry that was titled in the name of the MCC Trust.  Doc. 33-1 at 12 (Nolan Aff. ¶ 38); Doc. 33-4 at 90 (Attach. 38); *Id.* at 92–95 (Attach. 39).

**Art:**  Between January 2014 and September 2015, James and/or Melissa Carnes, as co-trustees, purchased works of art worth, in total, $270,312.  Doc. 33-1 at 13 (Nolan Aff. ¶ 39); Doc. 33-4 at 92–95 (Attach. 39); Doc. 33-4 at 97 (Attach. 40).  Titles for those works of art issued in the name of the MCC Trust.  Doc. 33-1 at 13 (Nolan Aff. ¶ 39); Doc. 33-4 at 92–95 (Attach. 39); Doc. 33-4 at 97 (Attach. 40).

**Yellowstone Club Property:**  Between January 2014 and March 2015, James and/or Melissa Carnes, as co-trustees of the MCC Trust, made two payments totaling $2,939,716.78 to purchase a condominium at the Yellowstone Club.  Doc. 33-1 at 13 (Nolan Aff. ¶ 40); Doc. 33-4 at 99–101 (Attach. 41); *Id.* at 104 (Attach. 42); *Id.* at 107 (Attach. 43).  James and Melissa Carnes sold this condo in 2019.  Doc. 33-1 at 13 (Nolan Aff. ¶ 40).  The current record doesn't reveal the destination of the proceeds of this sale.  *See id.*

### *Evidence of Disposal, Removal, or Waste of Assets*

As pertinent here, the Bureau cites three pieces of evidence to show that the Carnes have disposed, removed, or wasted assets:  dissipation of money from the MCC Stephens Account; a transaction with Tulip Trading, LLC; and a purchase of a second Yellowstone Club property. The court outlines each piece of evidence, below.

Start with the Stephens Account:  the MCC Stephens Account has moved through three different accounts.  And the Bureau alleges that, over time, the balance of that account has dwindled.  The first iteration of the account ended in 2821.  Doc. 33-1 at 14 (Nolan Aff. ¶ 41). The 2821 account had a high balance of $11,195,175.69 on December 31, 2013.  *Id.*; Doc. 33-4 at 109–12 (Attach. 44).  And the 2821 account had a balance of $6,778,292.72 on October 31, 2019, just before, at some point in November 2019, this entire account balance was transferred to an account ending in 8105.  Doc. 33-1 at 14 (Nolan Aff. ¶ 41); Doc. 33-4 at 111 (Attach. 44). The money in the 8105 account was transferred to a new account ending in 1688 in February 2020.  Doc. 33-1 at 14 (Nolan Aff. ¶ 41); Doc. 33-4 at 111 (Attach. 44).  At the time of this transfer in February 2020, the 1688 account had a balance of $6,256,890.29.  Doc. 33-1 at 14 (Nolan Aff. ¶ 41); Doc. 33-4 at 111 (Attach. 44).  But, by June 30, 2022, the 1688 account had a balance of $744,002.41.  Doc. 33-1 at 14 (Nolan Aff. ¶ 41); Doc. 33-4 at 112 (Attach. 44); *Id.* at 163 (Attach. 62).  The Bureau's affiant asserts that this reduction shows the Carnes dissipated the funds in the Stephens Account over two years.  Doc. 33-1 at 14 (Nolan Aff. ¶ 41).  This 1688 account is the only MCC Trust account currently open at Stephens.  *Id.* at 18–19 (Nolan Aff. ¶ 55).  The 1688 account received the entire balance from the other two Stephens accounts, including the 2821 account that received the four allegedly fraudulent transfers.  *Id.*

The Bureau also adduces evidence about an entity called Tulip Trading, LLC to show disposal, removal, or waste.  Tulip Trading was formed on September 29, 2020, in Las Vegas, Nevada.  Doc. 33-1 at 16 (Nolan Aff. ¶ 50); Doc. 33-4 at 128–29 (Attach. 50).  Tulip Trading's reported business address is the address of David P. Lieberman.  Doc. 33-1 at 16 (Nolan Aff. ¶ 50); Doc. 33-4 at 128–29 (Attach. 50).  And Tulip Trading's listed managers are Peter T. Benz and David P. Lieberman.  Doc. 33-1 at 16 (Nolan Aff. ¶ 50); Doc. 33-4 at 128–29 (Attach. 50).

The government's affiant testified that the problem with this transaction lies with Mr. Benz and Mr. Lieberman.  Doc. 55 at 97–98 (Hr'g Tr. 97:24–98:10).  She testified that Mr. Benz and Mr. Lieberman had engaged in fraudulent behavior in the past.  *Id.*

The MCC Trust loaned Tulip Trading $450,000.  Doc. 33-1 at 16–17 (Nolan Aff. ¶ 51); Doc. 33-4 at 131–32 (Attach. 51).  The transfer of the $450,000 occurred on December 11, 2020, via wire transfer, authorized by James Carnes.  Doc. 33-1 at 17 (Nolan Aff. ¶ 52); Doc. 33-4 at 134–35 (Attach. 52); *Id.* at 137 (Attach. 53).  Tulip Trading promised to pay the $450,000 with interest on the unpaid principal, and annual interest payments calculated at 90% of all profits generated each year.  Doc. 33-1 at 16–17 (Nolan Aff. ¶ 51); Doc. 33-4 at 131–32 (Attach. 51).  So, if Tulip Trading doesn't generate an annual profit, it doesn't pay interest or principal on the loan.  Doc. 33-1 at 16–17 (Nolan Aff. ¶ 51).

Tulip Trading transferred $25,000 on December 9, 2020, and another $25,000 two days later on December 11, 2020, to a Bank of America Tulip Trading account, ending in 1330.  Doc. 33-1 at 17 (Nolan Aff. ¶ 53); Doc. 33-4 at 139–40 (Attach. 54).  On that same day, December 11, 2020, Tulip Trading wired $495,000 from the Bank of America account to an Interactive Brokers brokerage account.  Doc. 33-1 at 17 (Nolan Aff. ¶ 53); Doc. 33-4 at 139–40 (Attach. 54).  From December 15, 2020, to December 31, 2022, the Bank of America Tulip Trading account didn't have any funds deposited into it or transferred out of it, other than small transactions and payment of bank service fees.  Doc. 33-1 at 17 (Nolan Aff. ¶ 53); Doc. 33-4 at 139–40 (Attach. 54); *Id.* at 142 (Attach. 55).  On December 31, 2022, the Interactive Brokers brokerage account had an ending balance of $330,052.54.  Doc. 33-1 at 17 (Nolan Aff. ¶ 53); Doc. 33-4 at 144–46 (Attach. 56).

And, finally, the Bureau invokes the Yellowstone Club property.  On August 17, 2020, the MCC Stephens Account wired $2,706,478.64 to purchase a second Yellowstone Club property.  Doc. 33-1 at 19 (Nolan Aff. ¶ 56); Doc. 33-4 at 165–66 (Attach. 63); *Id.* at 168 (Attach. 64); *Id.* at 170 (Attach. 65).  James Carnes authorized this transfer.  Doc. 33-1 at 19 (Nolan Aff. ¶ 56); Doc. 33-4 at 168 (Attach. 64).  And the MCC Trust owns this property.  Doc. 33-1 at 19 (Nolan Aff. ¶ 56); Doc. 33-4 at 170 (Attach. 65).

With the Bureau's evidence of disposal, removal, or waste recounted, the court next recites the history of the Bureau's legal actions against James Carnes.

### The Bureau & James Carnes

The Bureau took an investigative hearing of James Carnes himself on June 17, 2014— after the First, Second, and Third Transfers, but before the November 2015 Fourth Transfer. Doc. 33-1 at 8 (Nolan Aff. ¶ 22).  On October 23, 2014, the Bureau notified James Carnes that it was considering taking legal action against him.  *Id.*  The Bureau ultimately initiated an administrative proceeding against James Carnes on November 18, 2015—the same day when he made the Fourth Transfer.  *Id.*

### Judgment & Fraudulent Transfer Action

On July 30, 2021, this court entered a judgment against James Carnes and his company, Integrity Advance, LLC, that requires a restitution payment of $38,453,341.62 and a $5,000,000 civil penalty against James Carnes.  Doc. 1 at 4 (Compl. ¶ 13); *see also* Judgment, *Consumer Financial Protection Bureau v. Integrity Advance, LLC*, No. 21-mc-206, (D. Kan. July 30, 2021), ECF No. 22.  Neither James Carnes nor Integrity Advance have made any payments to satisfy this judgment.  Doc. 33-1 at 3 (Nolan Aff. ¶ 8).

The government filed this action on April 5, 2023.  Doc. 1 (Compl.).  This is a fraudulent transfer action that seeks to collect $12,269,072.89 that was allegedly fraudulently transferred

from the JRC Trust to the MCC Trust.  *See generally id.*; *see also* Doc. 33-1 at 3 (Nolan Aff.

¶ 9).  The government alleges that, "after [James] Carnes became aware of the Bureau's

investigation into his illegal payday lending business, he began transferring significant assets to

the MCC Trust[.]"  Doc. 1 at 2 (Compl. ¶ 1).  The government alleges that between "2013 and

2015, [James] Carnes fraudulently transferred $12.3 million from himself (through the JRC

Trust) to the MCC Trust."  *Id.*

***The Bureau's Ex Parte Application for Writ of Garnishment
and Writ of Attachment***

On July 13, 2023, the Bureau filed an "Application of the Consumer Financial Protection

Bureau for Writ of Garnishment and Writ of Attachment to Prevent Assignment, Disposal,

Removal, Concealment, or Waste of Assets of the Melissa C. Carnes Revocable Trust Pending

Resolution of FDCPA Fraudulent Transfer Action" (Doc. 33).  The Bureau's application sought

to:

- prevent James Carnes and Melissa Carnes "from assigning, disposing, removing, concealing, or wasting the assets of the" MCC Trust;

- preserve the status quo; and

- protect the court's ability to provide effective final relief.

Doc. 33 at 2.  The Bureau asserted that it had "reasonable cause to believe that, in the absence of

immediate relief from the Court, James and Melissa Carnes have or are about to assign, dispose,

remove, conceal, or waste assets held by the MCC Trust[.]"  *Id.*  The Bureau noted that the

"MCC Trust account, which received and once held millions of dollars in transferred funds, has

been reduced to a fraction of that amount because of James and Melissa Carnes' continued

evasion of the Bureau's efforts to collect on its order and this Court's judgment against James

Carnes."  *Id.*  The Bureau's application sought a writ of garnishment and a writ of attachment to

12

preserve the status quo and "assure that the MCC Trust retains any and all assets up to the $12.3 million judgment that the Bureau seeks to collect in this action[.]" *Id.*

The court granted the Bureau's application.  Doc. 35.  It thus issued a writ of garnishment to Stephens.  Doc. 36 at 1–2.  The court also issued a writ of attachment against the second Yellowstone Club property.  Doc. 36-2 at 1–3.

### *Post-Deprivation Hearing*

James Carnes and Melissa Carnes both filed Motions to Quash the Ex Parte, Prejudgment Writs.  Doc. 37; Doc. 38.  And they requested a post-deprivation hearing under 28 U.S.C. § 3101(d)(2).  Doc. 37; Doc. 38.  As explained in more detail below, 28 U.S.C. § 3101 limits the subject matter of a post-deprivation hearing.  When the court conducted the requested hearing, James Carnes and Melissa Carnes declined to proffer evidence of their own.  Instead, they focused on attacking the probable validity of the Bureau's claim by cross-examining the Bureau's investigator, Kathleen Nolan.[4]  Below, the court recounts relevant parts of that hearing.[5]

Melissa Carnes's counsel examined Ms. Nolan.  The examination focused almost exclusively on the contents of her affidavit.  Ms. Nolan testified that she began investigating Integrity Advance and James Carnes in July of 2022.  Doc. 55 at 23–24 (Hr'g Tr. 23:25–24:2). The Bureau tasked her with determining "how the money from the sale of Integrity Advance was deposited into Carnes' family's accounts" and how "that money was transferred to [the] Melissa

---

[4]     As the citations in this section evidence, Ms. Nolan's affidavit formed the factual basis of the Bureau's application for the prejudgment writs.

[5]     Counsel for both James Carnes and Melissa Carnes examined Ms. Nolan about her credentials and investigative experience.  Ms. Nolan is a certified fraud examiner with a firm grasp of the issues in the case and years of experience with financial investigations.  To the extent this line of questioning attempted to undermine Ms. Nolan's credibility, the court finds it unpersuasive and, thus, irrelevant.

13

Carnes Trust." *Id.* at 24 (Hr'g Tr. 24:10–16). Ms. Nolan investigated the entire Carnes family because, she explained, in typical financial investigations with fraudulent transfers, "you look at the family first." *Id.* (Hr'g Tr. 24:17–23). Ms. Nolan clarified that she wasn't claiming that James Carnes and Melissa Carnes created the JRC Trust and the MCC Trust for fraudulent purposes, or that creating the trusts qualified as fraudulent behavior. *Id.* at 34–35 (Hr'g Tr. 34:25–35:10).

The questions asked by Melissa Carnes's counsel focused on the timing of James Carnes's notice. Counsel emphasized that the Bureau didn't serve a CID on James Carnes himself until 2014. *Id.* at 37 (Hr'g Tr. 37:1–12). Counsel also pointed out that the FTC's 2012 lawsuit in the District of Nevada against AMG didn't assert violations of the Consumer Financial Protection Act. *Id.* at 39–40 (Hr'g Tr. 39:11–40:12). Ms. Nolan clarified that the FTC brought the AMG case, and the Bureau didn't exist at the time. *Id.* at 40–41 (Hr'g Tr. 40:21–41:9). Counsel also asked Ms. Nolan about the loan from the MCC Trust to the JRC Trust, and Ms. Nolan confirmed the details. *Id.* at 41–42 (Hr'g Tr. 41:25–42:14).

Melissa Carnes's counsel implied that no one had done anything improper with the MCC Trust. For example, Ms. Nolan confirmed that the property purchased by the MCC Trust—art, jewelry, a Yellowstone Club property—likely appreciated in value over time. *Id.* at 44–47 (Hr'g Tr. 44:20–47:6). Ms. Nolan confirmed that the property purchases were publicly recorded, and no one had concealed purchases of art and jewelry. *Id.* at 44–46 (Hr'g Tr. 44:24–46:4).

Melissa Carnes's counsel then asked Ms. Nolan about efforts to sell the property. Ms. Nolan acknowledged that she didn't have evidence that the MCC Trust planned to sell the Yellowstone Club property. *Id.* at 56 (Hr'g Tr. 56:7–14). But Ms. Nolan expressed her concern

that, because the MCC Trust had purchased the property with cash and the property is highly valued, the property could attract a cash buyer and "it could be sold in two weeks." *Id.*

James Carnes's counsel also questioned Ms. Nolan. Counsel emphasized that James Carnes's Motion to Quash "is very limited in scope[.]" *Id.* at 8 (Hr'g Tr. 8:4–10). James Carnes asserts that he is no longer a trustee of the MCC Trust. And the prejudgment writs were directed to the MCC Trust and its co-trustees: James Carnes and Melissa Carnes. Doc. 36 at 2; Doc. 36-2 at 2. James Carnes thus asked the court to quash the writs against him in a capacity he no longer holds. Doc. 38 at 1. James Carnes's counsel also admitted an exhibit manifesting the MCC Trust amendment removing James Carnes as co-trustee. Doc. 55 at 93–94 (Hr'g Tr. 93:10–94:17); *see also* Doc. 18-1.

Despite the narrow scope of James Carnes's Motion to Quash, his counsel examined Ms. Nolan about a broad range of subjects. James Carnes's counsel asked Ms. Nolan whether she had considered the totality of James Carnes's financial circumstances during her investigation. Doc. 55 at 61 (Hr'g Tr. 61:8–20). Ms. Nolan testified that she reviewed only the specific accounts mentioned above, and she did not know if James Carnes had retained separate assets for himself that he didn't transfer to the MCC Trust. *Id.* (Hr'g Tr. 61:8–11). James Carnes's counsel also asked Ms. Nolan whether she'd considered alternative explanations for some of the facts she had recited about her investigation. For example, Ms. Nolan confirmed that merely creating a trust for estate planning purposes and benefitting from a trust—in general—don't qualify as fraudulent activities. *Id.* at 62 (Hr'g Tr. 62:1–11). James Carnes's counsel asked whether Ms. Nolan had considered whether the transfers were made for death tax, gift tax, or estate planning purposes. *Id.* at 68 (Hr'g Tr. 68:4–21). She responded that she hadn't. *Id.*

James Carnes's counsel next asked about the MCC Trust's Tulip Trading investment. *Id.* at 63 (Hr'g Tr. 63:11–18). Counsel noted that the Tulip Trading investment had decreased in value because the market fell and asked Ms. Nolan whether she blamed James Carnes and Melissa Carnes for the stock market's 2022 returns. *Id.* at 65 (Hr'g Tr. 65:6–24). Ms. Nolan confirmed that she didn't blame James Carnes and Melissa Carnes for the market's downturn. *Id.* Rather, Ms. Nolan testified that she "thought it was untoward the people that they chose to invest with" because "both Mr. Benz and Mr. Lieberman had been engaged in fraudulent behavior in the past in public records." *Id.* Ms. Nolan acknowledged that this fact didn't make its way into her affidavit. *Id.* Also, James Carnes's counsel implied that the Tulip Trading investment failed to show evidence of asset wasting because its value dipped due to a mere dip in the market—not anything James Carnes or Melissa Carnes did. *Id.* at 67 (Hr'g Tr. 67:2–11).

Next, the Bureau's questioning[6] of Ms. Nolan addressed the issue of James Carnes's status as trustee of the MCC Trust. Ms. Nolan testified that she found no evidence suggesting that James Carnes was no longer an authorized signatory on the MCC Stephens Account. *Id.* at 83 (Hr'g Tr. 83:9–13).

The Bureau also asked Ms. Nolan to explain Attachment 44 to her affidavit. *Id.* at 85 (Hr'g Tr. 85:3–6). Ms. Nolan explained that she had created Attachment 44, an Excel spreadsheet of the account balances of the MCC Stephens Account and its three iterations. *Id.* (Hr'g Tr. 85:7–23). The spreadsheet summarizes activity beginning in January 2013 and ending in June 2022—every month for which the Bureau had records. *Id.*; *see also* Doc. 33-4 at 109–12 (Attach. 44). Ms. Nolan testified that she created the spreadsheet to show that the MCC

---

[6] A brief note to explain the order of events: The court viewed Ms. Nolan's affidavit as her "direct" testimony. Ms. Nolan's live testimony thus began with Melissa Carnes and James Carnes's cross-examination of Ms. Nolan. This section describes the Bureau's "re-direct" of Ms. Nolan.

Stephens Account went from a high of $11.2 million in December of 2013 to a balance of $744,000 in June of 2022.  Doc. 55 at 85 (Hr'g Tr. 85:7–15); Doc. 33-4 at 109–12 (Attach. 44).

Ms. Nolan said that she didn't find any significant transfers out of the MCC Stephens Account for which the account received reasonable value.  Doc. 55 at 87 (Hr'g Tr. 87:7–10). When James Carnes's counsel re-cross-examined Ms. Nolan, Ms. Nolan testified that the MCC Trust account received *some* consideration:  the Yellowstone Club property and a promissory note from Tulip Trading.  *Id.* at 95–96, 97 (Hr'g Tr. 95:4–96:4, 97:7–23).  Ms. Nolan explained that she flagged the Tulip Trading transfer as potentially fraudulent because "the owners that created Tulip Trading are not the most reputable places to [place] $450,000."  *Id.* at 97–98 (Hr'g Tr. 97:24–98:5).

Ms. Nolan also testified that she found it unusual and suspicious that they had transferred all assets in the MCC Stephens Account three times.  *Id.* at 86 (Hr'g Tr. 86:2–19).  Ms. Nolan explained that "if you're going to have . . . that much money in one financial institution it doesn't really make sense to keep chang[ing] account numbers."  *Id.*  When Melissa Carnes's counsel re-cross-examined Ms. Nolan, Ms. Nolan testified that she didn't consider any non-suspicious reason for these account transfers, like increased interest.  *Id.* at 92 (Hr'g Tr. 92:19–25).[7]

## II.   Legal Standard

The Bureau applied for a prejudgment writ of garnishment and writ of attachment under 28 U.S.C. § 3101.  Section 3101(a)(1) provides, "The United States may, in a proceeding in conjunction with the complaint or at any time after the filing of a civil action on a claim for debt, make application under oath to a court to issue any prejudgment remedy."  That application must

---

[7]     The court's review of the hearing omits the hearing's discussion of a loan that Peter Benz made to James Carnes for James Carnes's Mercedes G-Wagon.  The Bureau doesn't mention this loan in its application for the prejudgment writs, so the court considers this discussion irrelevant to the current endeavor.

meet certain requirements.  The application must "set forth the factual and legal basis for each prejudgment remedy sought."  28 U.S.C. § 3101(a)(2).  The factual support for the application must take the form of an affidavit.  *Id.* at § 3101(c).

The affidavit must "establish[] with particularity to the court's satisfaction facts supporting the probable validity of the claim for a debt and the right of the United States to recover what is demanded in the application."  *Id.* at § 3101(c)(1).  The affidavit must state:

(A)  "specifically the amount of the debt claimed by the United States and any interest or costs attributable to such debt;"

(B) "one or more of the grounds specified in subsection (b); and"

(C) "the requirements of section 3102(b), 3103(a), 3104(a), or 3105(b), as the case may be."  *Id.* at § 3101(c)(2).

Focus here on the second affidavit requirement:  the government must show one of § 3101(b)'s grounds—with reasonable cause—for the court to grant a prejudgment remedy.  *Id.* at § 3101(b).  Here, the government invokes the following grounds from this provision: "reasonable cause to believe that . . . the debtor . . . has or is about to assign, dispose, remove, conceal, ill treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States[.]"  *Id.* at § 3101(b)(1)(B).

The debtor defendant can request a post-deprivation hearing and as mentioned above, both James Carnes and Melissa Carnes asked for, and the court granted them a hearing.  *Id.* at § 3101(d)(2).  The governing statute limits the issues considered in a § 3101(d) hearing to:

(A)  the probable validity of the claim for the debt for which such remedy was granted and of any defense or claim of exemption asserted by such person;

(B)  compliance with any statutory requirement for the issuance of the prejudgment remedy granted;

(C)  the existence of any ground set forth in subsection (b); and

(D) the inadequacy of alternative remedies (if any) to protect the interests of the United States.

*Id.* at § 3101(b)(2)(A)–(D).

"At a post-deprivation hearing, the Government and the debtor defendants generally engage in a burden-shifting exercise where the debtor bears the initial burden of putting forward evidence that places the Government's showing of the probable validity of the debt in dispute." *United States v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 460, 465 (D.S.C. 2016). "The debtor is not required 'to present affirmative evidence to successfully challenge the United States's showing,' but instead may put the probable validity in dispute 'through cross-examination of the affiant or other witnesses relied on by the United States.'" *Stabl*, 2018 WL 6068424, at *3 (quoting *United States ex rel. Doe v. DeGregorio*, 510 F. Supp. 2d 877, 885–86 (M.D. Fla. 2007) (brackets omitted)). But in some cases, the debtor must present affirmative evidence at the hearing. If "the affidavit is particularized and the affiant's sources of information are reliable because they have personal knowledge of the events to which they provided information, the debtor must come forward with 'some substantive evidence at the hearing.'" *Berkeley Heartlab*, 225 F. Supp. 3d at 465 (quoting *DeGregorio*, 510 F. Supp. 2d at 885). Notably, here, Melissa Carnes declined to present any affirmative evidence of her own at the § 3101(d) hearing.

With these legal standards firmly in mind, the court turns to the merits of the parties' current dispute. It starts with James Carnes's motion, then addresses Melissa Carnes's motion.

### III.    James Carnes's Motion to Quash (Doc. 38)

As mentioned above, James Carnes's Motion to Quash (Doc. 38) is a narrow one. James Carnes asks the court to quash the prejudgment writs because they refer to him as a co-trustee of the MCC Trust, and he's no longer a co-trustee of the MCC Trust.

Indeed, at the hearing, the court admitted Defendant's Exhibit 5:  an amendment to the

MCC Trust removing James Carnes as trustee.  Doc. 55 at 93–94 (Hr'g Tr. 93:10–94:17).  And,

under Kansas law,[8] "the trustee is the proper person to sue or be sued on behalf of the trust."

*Schaake v. City of Lawrence*, 491 P.3d 1265, 1270 (Kan. Ct. App. 2021) (invoking Kan. Stat.

Ann. § 58a-816(24) ("[A] trustee may . . . prosecute or defend an action, claim or judicial

proceeding[.]")).  The Bureau thus can't act against the MCC Trust through James Carnes for the

simple reason that he isn't a trustee of the MCC Trust, so the court grants James Carnes's Motion

to Quash (Doc. 38).

Also, James Carnes's counsel has agreed to an order that he won't serve as trustee as long

as this case is pending.  Doc. 55 at 111–12 (Hr'g Tr. 111:21–112:14).  The court agrees that such

---

[8]      James Carnes's Motion to Quash cites Kansas law.  Doc. 38.  But the motion doesn't explain why
it's applying Kansas law.  *See id.* at 3.  The court must "apply federal common law choice of law
principles when [it] exercise[s] federal question jurisdiction over a case."  *Singletary v. United Parcel
Serv., Inc.*, 828 F.3d 342, 351 (5th Cir. 2016) (citation and internal quotation marks omitted); *see also
Prudential Ins. Co. of Am. v. Doe*, 140 F.3d 785, 791 (8th Cir. 1998) (explaining that courts are "required
to apply federal common law when deciding federal questions"); *Schoenberg v. Exportadora de Sal, S.A.,
de C.V.*, 930 F.2d 777, 782 (9th Cir. 1991) (holding in a federal question case that "federal common law
applies to the choice of law rule determination"); *Barkanic v. Gen. Admin. of Civil Aviation of the
People's Republic of China*, 923 F.2d 957, 961 (2d Cir. 1991) ("Where jurisdiction is based on the
existence of a federal question ... we have not hesitated to apply a federal common law choice of law
analysis."); *Cyprus Amax Mins. Co. v. TCI Pac. Commc'ns, Inc.*, No. 11-CV-252-GKF-PJC, 2012 WL
4006122, at *4 (N.D. Okla. Sept. 12, 2012) ("[C]ircuit courts have concluded that a federal common law
choice-of-law analysis should be conducted when the issue is a federal question" (citation and internal
quotation marks omitted)); *Nat'l Fair Hous. All., Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46,
62 (D.D.C. 2002) ("Where federal question jurisdiction is invoked, as here, federal courts generally apply
federal common law principles to resolve choice of law disputes.").

        "[W]hen conducting a federal common law choice-of-law analysis, absent guidance from
Congress," courts "consult the Restatement (Second) of Conflict of Laws."  *Eli Lilly Do Brasil, Ltda. v.
Fed. Express Corp.*, 502 F.3d 78, 81 (2d Cir. 2007); *see also Cyprus Amax Mins.*, 2012 WL 4006122, at
*4 ("[C]ourts have relied upon the Restatement (Second) of Conflicts of the Law for the content of
federal common law." (citation and internal quotation marks omitted)); *Nat'l Fair Hous. All.*, 208 F.
Supp. 2d at 62 ("Federal common law follows the approach of the Restatement (Second) of Conflicts of
Laws.").

        James Carnes's motion fails to provide any choice of law analysis.  But the Bureau never argues
that the motion applies the wrong law.  The court, following the lead of James Carnes's unchallenged
motion, thus applies Kansas law.

an order would provide an "adequate alternative remedy" as contemplated by 28 U.S.C. § 3101(d)(2)(D). So, the court accepts his counsel's offer and now orders that James Carnes must not serve as a trustee of the MCC Trust during this case's lifespan.

Separately the Bureau has expressed concerns about James Carnes's ability to sign for the MCC Stephens Account. That concern is valid. Garnishee Stephens, Inc. filed an Answer (Doc. 44) to the writ of garnishment. Its Answer provided, "James R. Carnes, spouse of Melissa C. Carnes, was removed as Co-Trustee on the account on May 8, 2023. Our records indicate that he retains check-writing authority on the account." Doc. 44 at 2. The check-writing authority— while concerning—doesn't change the court's underlying conclusion, *i.e.*, that the Bureau must proceed against the MCC Trust's trustees.

Fortunately, Melissa Carnes has offered a solution to this concern. At the hearing, Melissa Carnes's counsel represented that Melissa Carnes had removed James Carnes as an authorized signatory on all the trust accounts. Doc. 55 at 112–13 (Hr'g Tr. 112:20–113:5). And Melissa Carnes's counsel offered to share documents with the Bureau. The court thus orders Melissa Carnes to provide the relevant documents to the Bureau within seven days of this Memorandum and Order.

With James Carnes's Motion to Quash resolved, the court next addresses Melissa Carnes's Motion to Quash.

## IV.    Melissa Carnes's Motion to Quash (Doc. 37)[9]

Melissa Carnes asks the court to quash the prejudgment writs against the MCC Stephens Account and the Yellowstone Club property. To start, she argues that Ms. Nolan's affidavit

---

[9]    Melissa Carnes's Motion to Quash (Doc. 37) incorporates arguments from her Motion to Dismiss (Doc. 19). The court denied Melissa Carnes's Motion to Dismiss on September 20, 2023. Doc. 69. The court need not and does not rehash those rulings here.

constitutes inadmissible hearsay, so the Bureau's entire application falls short.  She then invokes due process.  The court begins its analysis with these threshold issues.  Then, it turns to Melissa Carnes's substantive arguments about the Bureau's § 3101 application:  the probable validity of the debt, and the § 3101(b) grounds for a prejudgment remedy.

### A.      The Rules of Evidence

As a threshold matter, the court must address Melissa Carnes's argument about the admissibility of Ms. Nolan's affidavit.  Melissa Carnes contends that the Federal Rules of Evidence apply here.  She argues that Ms. Nolan's affidavit recites hearsay and "is therefore full of inadmissible testimony and constitutes an insufficient affidavit."  Doc. 37 at 7.  And, because Ms. Nolan's affidavit is insufficient, Melissa Carnes argues, the Bureau's application is "deficient because it is not supported by admissible evidence."  *Id.* at 7–8.  As the court stated at the post-deprivation hearing, it doesn't view this proceeding as a trial on the merits to which the Federal Rules of Evidence apply.  The court explains its reasoning, below.

Our Circuit has not addressed—at least not directly—applications and hearings under 28 U.S.C. § 3101.  Nonetheless, our Circuit has addressed a similar context:  preliminary injunction hearings.  "A hearing for preliminary injunction is generally a restricted proceeding, often conducted under pressured time constraints, on limited evidence and expedited briefing schedules."  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).  A "'preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.'"  *Id.* (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  The Circuit identified the bottom line for its ruling this way:  "Federal Rules of Evidence do not apply to preliminary injunction hearings."  *Id.*

The court predicts that our Circuit would apply the same reasoning to post-deprivation hearings under 28 U.S.C. § 3101.  Like a preliminary injunction hearing, § 3101 explicitly

envisions time constraints: "The court shall hold a hearing on [the § 3101] motion as soon as practicable, or, if requested by a debtor, within 5 days after receiving the request for a hearing or as soon thereafter as possible." 28 U.S.C. § 3101(d)(2). Like a preliminary injunction hearing, a § 3101 hearing also features limited evidence—the debtor need not even put on substantive evidence. *Stabl*, 2018 WL 6068424, at *3. And, like a preliminary injunction hearing, a § 3101 hearing is not a trial on the merits. "Nowhere in the test or history of [28 U.S.C. § 3101] is it suggested that this hearing is intended to be a trial on the merits." *United States v. Teeven*, 862 F. Supp. 1200, 1217 n.22 (D. Del. 1992). The court thus concluded, as it said at the hearing, that the Federal Rules of Evidence didn't govern the post-deprivation hearing.

Outside the post-deprivation hearing context, Melissa Carnes argues that Ms. Nolan's affidavit is "full of inadmissible testimony and constitutes an insufficient affidavit." Doc. 37 at 7. Melissa Carnes doesn't cite any authority for her proposition. To the contrary, the court "need not exclude from its consideration *any* evidence, whether admissible at trial or not, supporting or contradicting the probable validity of the debt." *Teeven*, 862 F. Supp. at 1217 n.22. The court thus concludes that the Federal Rules of Evidence did not apply to the § 3101(d) hearing and thus rejects Melissa Carnes's argument that Ms. Nolan's affidavit is insufficient because it contains hearsay.

### B.      Due Process

In her motion and during the post-deprivation hearing, Melissa Carnes invoked due process. Doc. 37 at 4 ("CFPB's end around due process . . . ."); Doc. 55 at 13 (Hr'g Tr. 13:2–12) ("The government takes the position that it is incumbent upon Ms. Carnes and the MCC Trust . . . to prove a negative that there's no need for these prejudgment remedies inconsistent with Ms. Carnes' due process rights[.]"); *Id.* at 19 (Hr'g Tr. 19:12–14) ("[W]e urge the court to quash this display of government overreach and fundamental deprivation of due process."). But

these references to due process are, at best, vague ones.  And Melissa Carnes doesn't cite any authority for the proposition that the Bureau has violated her due process rights.

To the extent Melissa Carnes asserts a due process violation, the court rejects her argument.  The FDCPA allows for prejudgment remedies.  28 U.S.C. § 3101.  And it allows the Bureau to seek those prejudgment remedies ex parte.  *Id.* at § 3101(d) (contemplating issuing a notice for service on a debtor notifying debtor that the United States is taking debtor's property); *Id.* at § 3004(c) (requiring government to serve notice on debtor at an "appropriate" time "but not later than the time a prejudgment or postjudgment remedy is put into effect").  Other courts have concluded that the FDCPA's prejudgment remedies scheme doesn't offend due process.  *See Teeven*, 862 F. Supp. at 1216 n.21 (concluding that § 3101 properly safeguards defendant because the "Government must satisfy the Court via a sworn affidavit that it has complied with the very specific requirements laid out by the statute for the writ to be issued; defendants receive prompt and detailed notice of the attachment as well as a full explanation of their present and future rights; and upon request, defendants are afforded a full and fair hearing within 5 days, on those issues critical to the granting of the prejudgment remedy").  The court rejects Melissa Carnes's vague arguments about due process.

With the threshold issues resolved, the court turns to Melissa Carnes's substantive arguments.

### C.    Probable Validity

Melissa Carnes argues that the Bureau has failed to demonstrate the probable validity of its claims.  This argument requires the court to begin its analysis by examining the probable validity standard.

Section 3101(c) requires the Bureau to include with its application an "affidavit establishing with particularity . . . the probable validity of the claim for a debt and the right of the

United States to recover what is demanded in the application." Of course, the court doesn't need to decide whether the Bureau has proved its case at this early stage. Instead, the probable validity requirement is akin to probable cause. *United States v. Cent. Med. Sys., LLC*, No. 6:14-cv-512-Orl-28TBS, 2018 WL 5112911, at *4 (M.D. Fla. Oct. 19, 2018) ("This 'probable validity' standard does not require proof rising to the level of that required at trial but rather requires only that the Government meet the probable cause standard."); *Teeven*, 862 F. Supp. at 1218 n.22 ("Nowhere in the text or the history of this statute is it suggested that this hearing is intended to be a trial on the merits. Thus, Defendant's claim that the Government must prove more than 'probable cause' is rejected."). "In evaluating probable validity, the 'totality of the circumstances' are considered." *Stabl*, 2018 WL 6068424, at *4 (quoting *Teeven*, 862 F. Supp. at 1218 n.24).

Defendants bear "'the initial burden of placing the Government's showing or the probable validity of the debt in dispute.'" *DeGregorio*, 510 F. Supp. 2d at 885 (quoting *Teeven*, 862 F. Supp. at 1216). But the government "still maintains the burden of showing compliance with the statute." *Teeven*, 862 F. Supp. at 1216. If the court determines "that the Government has complied with the statute in the first instance it has necessarily shown the probable validity of the debt." *Id.*

Here, the court granted the Bureau's application for the prejudgment writs. And, as mentioned above, the Bureau's application identified six badges of fraud:

- James Carnes made the four transfers to an insider, Melissa Carnes;

- The Bureau threatened James Carnes with suit before he made the transfers;

- James Carnes retained possession or control over transferred funds;

- There was no reasonably equivalent consideration for the transfers;

- James Carnes and Melissa Carnes concealed the transfers; and

- James Carnes and Melissa Carnes removed and concealed assets.

Doc. 33 at 10–16 (citing 28 U.S.C. § 3304(b)(2)(A)–(D), (G)–(H)).  Melissa Carnes's Motion to Quash attacks just two of these six badges:  whether the Bureau threatened James Carnes with suit personally before he made the transfers and whether James Carnes and Melissa Carnes removed and concealed assets.

The court concludes that Melissa Carnes's failure to challenge the Bureau's other badges of fraud doom her Motion to Quash.  These badges of fraud support the conclusion that James Carnes fraudulently transferred millions of dollars to the MCC Trust to hinder the Bureau from collecting on its judgment against him and his firm.  The court pauses here to summarize the circumstantial evidence the Bureau has adduced to support these unchallenged badges of fraud.

*Badge one*:  the transfers were to an insider, James Carnes's wife, Melissa Carnes.  *See* 28 U.S.C. § 3301(5)(A)(i) (defining insider to include "a relative of the debtor").  *Badge two*:  James Carnes, as co-trustee of the MCC Trust retained possession and control over the transferred funds.  As recited in the above factual background, the Bureau's application documents, in detail, demonstrate how James Carnes himself transferred money and wrote checks to various LLCs.  James Carnes also wrote himself checks totaling over $2 million. *Badge three*:  James Carnes concealed the transfers because hasn't complied with the Bureau's efforts to enforce the judgment.  That is, he's attempted to conceal information by resisting direct discovery.  *Badge four*:  the JRC Trust didn't receive reasonably equivalent consideration for at least three of the transfers.  The First, Second, and Third Transfers flowed from the JRC Trust to the MCC Trust and the JRC Trust received no reasonably equivalent consideration.  The Fourth Transfer indicates it's a "loan repayment," but the three other, larger transfers lack any

reasonably equivalent consideration.  With this circumstantial evidence unchallenged, Melissa Carnes has failed to carry her burden to challenge the probable validity of the debt.

Melissa Carnes's Motion to Quash also fails because her arguments about the other two badges of fraud fall short.  As noted above, she argues that the Bureau didn't threaten James Carnes with suit *personally* before he made the transfers.  And she argues that defendants haven't removed and concealed assets.  The court examines each proposition, in turn, below.

### 1.  Threat of Suit

Melissa Carnes argues that the Bureau has failed to establish the probable validity of its claims because three of the four fraudulent transfers predate the Bureau's threat of suit to James Carnes personally.  Here are the relevant dates:

- January 7, 2013:  The Bureau served a Civil Investigative Demand (CID) on Integrity Advance

- June 3, 2013:  First Transfer

- December 5, 2013:  Second Transfer

- December 19, 2013:  Third Transfer

- October 23, 2013:  The Bureau notified James Carnes that it was considering taking legal action against him

- November 18, 2015:  Fourth Transfer.

Melissa Carnes argues that the January 2013 CID served on Integrity Advance doesn't qualify as threatening James Carnes with suit.  The court disagrees.

The law doesn't support Melissa Carnes's proposed rule that the Bureau must send a formal notice to James Carnes directly.  In *Berkeley Heartlab*, the court held that a government subpoena issued to defendant's company put defendant "on notice regarding his debt to the Government.  Although he may not have known the precise contours of the Government's

claims, he should have known that they existed and potentially subjected him to liability." 225

F. Supp. 3d at 474 (denying motion to quash prejudgment remedies). In *United States v. Key*, a

fraudulent transfer action seeking to collect criminal restitution, the court held that defendant

"knew or reasonably should have known that she would face criminal prosecution for her crime

after her house was searched." 837 F. App'x 348, 352 (6th Cir. 2020). The court explained that

the threat-of-suit "badge of fraud applies where the defendant commits a crime and is aware of a

pending criminal investigation into her conduct before she makes a transfer." *Id.* Similarly, in

*Sherrill*, the court found that the threat-of-suit badge of fraud supported a finding of fraudulent

intent when—though the government hadn't yet commenced any legal action against him—the

debtor knew the SEC was investigating him when he made the transfers. 626 F. Supp. 2d at

1273. In each case, the court held that the debtor knew or should have known about the threat-

of-suit before the government actually filed suit.

These cases apply to this case's procedural facts. The Bureau has adduced evidence that

James Carnes knew or should have known about the threat of suit when the Bureau served a CID

on Integrity Advance in January 2013.[10] The Bureau's evidence identifies James Carnes as one

of two of Integrity Advance's officers, previously serving as its President and Assistant

Secretary. Integrity Advance's counsel met with Bureau enforcement staff on January 23, 2013.

Integrity Advance produced documents responsive to the Bureau's CID on October 25, 2013.

And in Integrity Advance's November 25, 2013, CID response, Integrity Advance identified

James Carnes as a person who had participated in responding to the CID by providing

information and reviewing written responses.

---

[10]    James Carnes thus knew or should have known of a pending investigation that could subject him
to liability in January 2013—before all four allegedly fraudulent transfers. So, the court need not decide
whether the FTC's action against Scott Tucker and AMG put James Carnes on notice of a pending
investigation.

This is sufficient evidence to conclude that James Carnes, as one of two Integrity Advance officers, assisted with his company's response to the Bureau's CID. Thus, it's reasonable to infer that James Carnes knew or should have known about the Bureau's investigation and that the investigation could lead to personal liability in January 2013, when Integrity Advance received the Bureau's CID. This threat of suit occurred before James Carnes made the alleged fraudulent transfers. Based on the totality of circumstances, this badge of fraud supports the probable validity of the debt.

## 2. Removing and Concealing Assets

Melissa Carnes also argues that the Bureau has failed to show the probable validity of the debt because it hasn't shown that James Carnes removed and concealed assets. She cites evidence that the MCC Trust has transferred money to the JRC Trust. And, in her Motion to Quash, she asks, presumably rhetorically, "If the point of the 2013 transactions from the JRC Trust to MCC Trust was to hide money from JRC Trust creditors, why then would money be transferred from MCC Trust *to* JRC Trust." Doc. 37 at 9 (emphasis in original). Melissa Carnes's motion also asserts that the Bureau's allegations about the transfers from the MCC Trust to the various LLCs don't matter because James Carnes's creditors can pursue those interests. *Id.* The court rejects this argument, too.

The Bureau correctly points out that more money flowed *out* of the JRC Trust to the MCC Trust than flowed *back* into the JRC Trust from the MCC Trust. James Carnes transferred $12.9 million from the JRC Trust to the MCC Trust. Meanwhile, only $3.1 million has returned to the JRC Trust, James Carnes himself, or James Carnes-adjacent LLCs. And, the Bureau asserts, merely moving this $3.1 million around makes it more difficult for the Bureau to follow the money. Indeed, prejudgment remedies "ensure that debtors cannot wreak havoc to the Government's efforts to collect on a probably valid debt." *Stabl*, 2018 WL 6068424, at *6

(internal quotation marks omitted).  The Bureau thus has adduced sufficient evidence for the court to find probable cause of removing and concealing assets.

In sum, Melissa Carnes has failed to shoulder her burden to "place[] the Government's showing of the probable validity of the debt in dispute."  *Berkeley Heartlab, Inc.*, 225 F. Supp. 3d at 465.  Her Motion to Quash leaves four badges of fraud unchallenged.  And the two badges of fraud that she does challenge still support, not undermine, the probable validity of the debt.

With the probable validity of the debt established, the court now turns to Melissa Carnes's arguments about the Bureau's grounds for its prejudgment remedy.

### D.  § 3101(b) Grounds

To secure a prejudgment remedy, the Bureau must show reasonable cause to believe that one of the grounds under 28 U.S.C. § 3101(b) exists.  Here, the Bureau's application purports to "show[] reasonable cause to believe that . . . the debtor . . . has or is about to assign, dispose, remove, conceal, ill treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States[.]"  28 U.S.C. § 3101(b)(1)(B).  Melissa Carnes argues that the Bureau has failed to make that showing.  The court's analysis of this argument begins by addressing her arguments about the governing legal standard.

Melissa Carnes asserts that the Bureau has "failed to prove the existence of a § 3101(b) emergency."  Doc. 37 at 9.  To begin with, the Bureau need not prove anything.  Instead, the statute requires the Bureau to show "reasonable cause."  28 U.S.C. § 3101(b).  Nor must the Bureau show an impending "emergency."  Evidence of past efforts to remove, dispose, or waste assets can qualify as § 3101(b) grounds.  *Stabl*, 2018 WL 6068424, at *6 (finding § 3101(b)(1)(B) grounds where "debtors *had*" removed millions from their accounts before the writs were issued (emphasis in original)).

Melissa Carnes also argues that the Bureau must show "nefarious purpose" or that the debtor made the transfers "because of the lawsuit." Doc. 37 at 10. Melissa Carnes bases this argument on *United States v. Johnson*, a case where the Idaho federal court held that the government had failed its burden to show reasonable cause under § 3101(b). 438 F. Supp. 3d 1185, 1192 (D. Idaho Feb. 10, 2020). In *Johnson*, the government asked the court to freeze the assets of a criminal defendant, Johnson, before sentencing. *Id.* at 1187. The government alleged that Johnson recently had assigned a power of attorney to a friend and instructed the friend to gather the Johnson's assets and sell them. *Id.* The court found that based "on the testimony and evidence at the hearing, however, this [was] not really the case." *Id.* at 1192. The court acknowledged that Johnson was trying to sell his assets, but it did "not appear he [was] doing so for any nefarious purpose or because of this case." *Id.* The court based this conclusion on evidence from the hearing: "United States Deputy Marshal Pete Thompson testified [the defendant] had done this—'flipped' vehicles—many times in the past as a way of making money." *Id. Johnson* doesn't apply here.

In *Johnson*, the court had testimony from a witness explaining the reason for the transfer. Unlike *Johnson*, defendants here didn't proffer any evidence explaining the actual reasons for the concerning transfers. To be sure, the attorneys cross-examining Ms. Nolan asked whether she'd considered alternative explanations for the facts of the case: creating trusts for estate planning, switching account numbers to take advantage of interest rates, transferring millions to avoid gift tax, etc. But questions by lawyers are not evidence. *See Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kan.*, 940 F.3d 498, 519 (10th Cir. 2019). Instead, counsel's inquiries merely speculated about alternative reasons for these actions. Neither James Carnes nor Melissa Carnes proffered any evidence to support these alternative explanations. *Johnson* thus doesn't apply

because the defendant in *Johnson* presented witness testimony to support his alternative explanation. Melissa Carnes didn't. The court also notes that the *Johnson* court found good cause to freeze Johnson's assets—in a separate order. *Id.* at 1187.

With *Johnson* inapplicable, the court looks for authority elsewhere to answer the question whether the Bureau must show intent. The available authority demonstrates that the Bureau need not show intent. *Stabl*, 2018 WL 6068424, at *6 ("The statute does not contain an intent requirement."). "The language of [§ 3101(b)(1)(B)] is clear—there is no requirement that the debtor receive any benefit from transferring or concealing property." *Cent. Med. Sys., LLC*, 2018 WL 5112911, at *7. "The statute only requires that the concealing or transferring have the '*effect* of hindering, delaying, or defrauding the United States.'" *Id.* (quoting 28 U.S.C. § 3101(b)(1)(B)–(C)). "In fact, the statute does not even require that a debtor intend to hinder or defraud the Government." *Id.* Instead, the "sole consideration is the effect of the debtor's actions." *Id.* With this standard in mind, the court turns to the Bureau's evidence about the effect of Melissa Carnes and James Carnes's actions.

The Bureau's application asserts that it "has identified recent and dramatic draining of the MCC Trust bank and brokerage accounts." Doc. 33 at 17. The Bureau provides that James Carnes and Melissa Carnes have "steadily removed or disposed of over $5.5 million[.]" *Id.* And the Bureau cites Ms. Nolan's accounting that the MCC Stephens Account's balance has fallen over time, from over $6 million in February 2020 to just $744,002 in June 2022. *Id.* (citing Doc. 33-1 at 14 (Nolan Aff. ¶ 41)); *see also* Doc. 33-4 at 109–12 (Attach. 44). Garnishee Stephens Inc.'s Answer valued the MCC Stephens Account at $572,672.30 on July 26, 2023. Doc. 44 at 2–3. This trend satisfies the reasonable cause standard. The draining of the account that

received allegedly fraudulent transfers has the "effect of hindering, delaying, or defrauding the United States[.]"  28 U.S.C. § 3101(b)(1)(B).

Melissa Carnes's Motion to Quash also argues the Bureau "does not allege *a single fact* that would support an imminent sale [of the Yellowstone Club property] or even a consideration to sell to justify attachment of the property[.]"  Doc. 37 at 4 (emphasis in original).  But the Bureau doesn't need to show an imminent sale of the Yellowstone Club property—past conduct can provide the relevant § 3101(b) grounds.  *Stabl*, 2018 WL 6068424, at *6 (finding § 3101(b)(1)(B) grounds where "debtors *had*" removed millions from their accounts before the writs were issued (emphasis in original)).

Here, the Bureau has adduced evidence that the MCC Stephens Account's balance plummeted from February 2020 to June 2022.  And, during this same period, the MCC Trust purchased the second Yellowstone Club property.  The Bureau also adduced evidence of a larger pattern of fraudulent transfers and dissipation of assets and its evidence about this Yellowstone Club property fits squarely within this pattern.  In any event, Ms. Nolan expressed her concern that, because the MCC Trust purchased the property with cash and the property is highly valued, the property could attract a cash buyer and "it could be sold in two weeks."  Doc. 55 at 56 (Hr'g Tr. 56:7–14).  The court thus concludes that the Bureau has established sufficient § 3101(b)(1)(B) grounds for the writs.

One last point before the court moves on:  Melissa Carnes argues that the Bureau improperly has conflated her actions with James Carnes's actions.  And, given that James Carnes no longer serves as a co-trustee of the MCC trust, she asks the court to quash these writs because the Bureau sought the writs based, in large part, on James Carnes's conduct.  The Bureau responds that "Melissa Carnes has been a participant and the ultimate authority for the MCC

Trust the entire time." Doc. 48 at 9.  The Bureau cites Melissa Carnes's statements from related proceedings where she has claimed that "James Carnes' authority as co-trustee of the Trust is expressly subordinate to my authority as co-trustee and grantor." *Id.* at 8 (citing Sworn Statement of Movant at 2, *Melissa C. Carnes Revocable Tr., Dated Feb. 10, 2010 v. Consumer Fin. Prot. Bureau*, No. 22-203 (D. Kan. Apr. 13, 2022), ECF No. 1-3.  This evidence is persuasive.  The court respectfully declines Melissa Carnes's invitation to find that James Carnes has acted entirely independently of Melissa Carnes.

In sum, the court concludes that the Bureau has shown the required grounds under 28 U.S.C. § 3101(b) and denies Melissa Carnes's Motion to Quash (Doc. 37).  The court next addresses Melissa Carnes's argument that the court should grant her Motion to Quash the writs because other, adequate remedies exist.

### E.      Adequate Alternative Remedies

Melissa Carnes proposes alternative, more narrowly tailored relief than the writs: removing James Carnes as co-trustee of the MCC Trust.  The court agreed with this principle, above, and ordered James Carnes to refrain from serving as a trustee of the MCC Trust for the duration of this lawsuit.  But Melissa Carnes bases her alternative remedies argument on the proposition that James Carnes is the sole problem.  Because the court just rejected the idea that James Carnes had acted entirely independently of Melissa Carnes, Melissa Carnes's proposed alternative remedy falls short.  James Carnes has dissociated himself from the trust, while Melissa Carnes attempts to hang all the blame on him.  To reward this game of hot potato would violate the purpose of prejudgment remedies:  "to ensure that debtors cannot wreak havoc to the Government's efforts to collect on a probably valid debt." *Stabl*, 2018 WL 6068424, at *6 (internal quotation marks omitted).

That leaves one last request from Melissa Carnes, addressed below.

F.      **Reasonable Living Expenses**

At the post-deprivation hearing, Melissa Carnes's counsel asked that—should the court decline to quash the writs—the court grant "leave to file an exception to that writ to allow for reasonable living expenses and legal costs." Doc. 55 at 114 (Hr'g Tr. 114:15–25). The court has declined to quash the writs. So, the court grants Melissa Carnes 14 days from the date of this Memorandum and Order to submit financial records that support the proposition that Melissa Carnes uses the MCC Trust for reasonable living expenses and legal costs.

Should Melissa Carnes ask for an exception to the writ, the Bureau shall have 14 days to respond. The court won't consider any replies.

V.     **Conclusion**

As explained above, the court grants James Carnes's Motion to Quash (Doc. 38). The court also grants James Carnes's requested alternative remedy: that he can't serve as co-trustee of the MCC Trust while this lawsuit remains pending. And the court orders Melissa Carnes to provide the Bureau with the documents verifying that she has removed James Carnes's check-writing authority on the MCC Stephens Account within seven days of this Order.

The court denies Melissa Carnes's Motion to Quash (Doc. 37). And the court grants Melissa Carnes 14 days to submit a request for an exception to the writs that would allow for reasonable living expenses and legal costs. Melissa Carnes must support that request with financial records that pre-date the Bureau's application for the writs.

**IT IS THEREFORE ORDERED BY THE COURT THAT** James Carnes' Motion to Quash (Doc. 38) is granted.

**IT IS FURTHER ORDERED** Melissa Carnes's Motion to Quash (Doc. 37) is denied.

**IT IS SO ORDERED.**

Dated this 9th day of November, 2023, at Kansas City, Kansas.

s/ Daniel D. Crabtree
Daniel D. Crabtree
United States District Judge
